UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HENRY BOONE,

                Defendant.

**S1 23 Cr. 328 (JPO)**

# THE GOVERNMENT'S RESPONSES TO THE DEFENDANT'S MOTIONS TO DISMISS AND SUPRESS EVIDENCE

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 38th Floor
New York, NY 10278

Jessica Greenwood
Assistant United States Attorney
    *Of Counsel*

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings on the defendant's motions to dismiss and suppress evidence and statements. (Dkt. No. 28, "Def. Br."). In particular, the Government seeks the following rulings:

1. The defendant's challenges to the application of the Armed Career Criminal Act ("ACCA") are not ripe, because whether a particular prior conviction is an ACCA predicate is a legal question to be determined by the court at the time of sentencing and the Government's attempts to collect relevant documents are ongoing. Relatedly, because the applicability of ACCA is a matter appropriately determined post-conviction, the defendant's pre-conviction request to dismiss portions of the Superseding Indictment based on his ACCA challenges is baseless.

2. The defendant's motion to dismiss the Superseding Indictment for violating the Second Amendment should be denied because the felon in possession statute is constitutional both on its face and as applied to the defendant.

3. The defendant's motion to suppress evidence and statements should be denied because the undisputed facts and video evidence establish that the arresting officers had lawful authority to stop and search, and even arrest, the defendant.

## BACKGROUND

### I. The Defendant's Criminal History

The defendant, who is currently 47 years old, has an extended criminal history dating back to when he was a teenager, including a conviction for which he spent nearly two decades in federal custody and for which he was on supervised release at the time of his current offense. For example, his prior convictions, all of which were adult convictions (even if committed when the defendant was a minor), include the following:[1]

---

[1] Unless otherwise noted, the descriptions of the defendant's criminal history are based on his state and federal RAP sheets, judgments of conviction, certificates of disposition, and the presentence investigation report from his prior federal conviction in Case No. S2 02 Cr. 1185 (RPP), all of which have been produced in discovery to the defendant in this case.

- <u>1992 State Robbery Conviction</u>.  In or about February 1992, the defendant was convicted in Bronx County Supreme Court of robbery in the second degree, aided by another, in violation of New York Penal Law Section 160.10(1).  This conviction arose out of a gunpoint robbery committed by the defendant and approximately nine other teenagers, who jumped a 13-year old victim outside of a New York City Housing Authority ("NYCHA") building on Webster Avenue in the Bronx.  When the victim refused a demand to give money to his attackers, or to sell drugs for them, one of the defendant's accomplices pointed a sawed-off shotgun at the victim's head, while another robbed him of $100.  The defendant and another accomplice punched the victim in the head several times, and the defendant warned the victim that the defendant would "fuck him up" if the victim did not give the defendant money.  As a result of this conviction, the defendant was sentenced to a term of imprisonment of 1 to 3 years.  The defendant was released on parole in or about November 1992, but his parole term was revoked when he was arrested on new charges (described immediately below) in or about February 1993.

- <u>1993 State Attempted Robbery Conviction.</u>  In or about February 1993, the defendant was convicted in Bronx County Supreme Court of attempted robbery in the second degree, aided by another, in violation of New York Penal Law Section 160.10(1).  This conviction arose out of a January 1993 incident involving the defendant and an accomplice at a NYCHA Building on Webster Avenue in the Bronx—the building where the defendant then resided.  The defendant and his accomplice followed a female into an elevator, where the defendant's accomplice brandished a gun and demanded money from the victim.  The defendant then punched the victim in the chest and forcibly removed cash and other items from the victim before the defendant and his accomplice fled the scene.  The defendant was sentenced to a term of imprisonment of 2 ½ to 5 years as a result of this conviction.  The defendant was admitted to a temporary release program, but

absconded from that program in or about May 1994 and, after committing another offense as described below, was returned to state custody for absconding in or about August 1994 . He was released on parole in or about July 1999, but again had his parole revoked in or about December 1999. He remained in state custody until the maximum expiration of this parole term in May 2000.

- <u>1996 State Attempted Assault Conviction</u>. In or about October 1996, the defendant was convicted in Bronx County Supreme Court for attempted assault in the first degree, in violation of New York Penal Law Section 120.10. This conviction arose out of a failed robbery of a nail salon in the Bronx committed by the defendant and an accomplice in or about July 1994—when the defendant absconded from the temporary release program on his 1993 State Attempted Robbery Conviction. In this incident, the defendant and his accomplice each brandished a firearm. The defendant used his gun to shoot a 26-year old man who was in the nail salon. The victim died a short time later at the hospital. The defendant and his accomplice fled the nail salon without taking any property. As a result of this conviction, the defendant was sentenced to a term of imprisonment of 2 ½ to 5 years. He was released on parole in or about July 1999, but as noted above, was re-admitted to state custody in or about December 1999 on a parole violation. He remained in state custody until the maximum expiration of this parole term in May 2000.

- <u>2003 Federal Conviction</u>.[2] In or about November 2003, the defendant was convicted after a jury trial in this district on five counts, specifically:

---

[2] Prior to his transfer to federal custody on his 2002 federal case, the defendant was in state custody at Rikers Island Correctional Facility. In June 2022, the defendant allegedly physically assaulted a Rikers Island corrections officer by punching him in the head. The defendant was charged in Bronx Criminal Court with assault in the first degree, among other offenses. After the defendant's transfer to federal custody, those charges were not pursued.

(i)    Count One:  possession with intent to distribute crack cocaine, in violation of Title 21, United States Code, Sections 812, 841(a), and 841(b)(1)(C) (the "2003 Federal Drug Conviction");

(ii)    Count Two:  possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i);

(iii)    Count Three: possession of a firearm with a defaced serial number, in violation of Title 18, United States Code, Section 922(k);

(iv)    Count Four:  felon in possession of a firearm, in violation of Title 18, Untied States Code, Section 922(g)(1) and 924(e)(2); and

(v)    Count Five:  felon in possession of ammunition, in violation of Title 18, United States Code, Section 922(g)(1) and 924(e)(2).

This conviction arose out of a June 2022 search of the defendant's apartment in a NYCHA building on Webster Avenue in the Bronx.  After law enforcement agents entered the apartment pursuant to a search warrant, an officer stationed on the ground level observed approximately 47 bags containing slabs of crack cocaine being thrown out of the window of the apartment.  Officers recovered a semi-automatic pistol with an obliterated serial number, and ammunition, in the apartment.  In a *Mirandized* post-arrest statement, the defendant admitted to living in the apartment, to throwing drugs out of the apartment window, and that there was a gun in his bedroom closet.  Despite these admissions, the defendant proceeded to trial and testified denying each of those facts.

As a result of his 2003 Federal Conviction, the defendant was sentenced principally to concurrent terms of imprisonment of 140 months (on Count One), five years (on each of Counts Three and Five), and fifteen years (on Count Four, as a result of the application of ACCA to this

particular count).  The defendant was also sentenced to a consecutive term of imprisonment of five years on Count Two.  Accordingly, the defendant was sentenced to a total of 20 years' imprisonment.  The defendant was also sentenced to concurrent terms of supervised release of three years (on Counts One and Three), and five years (on Counts Two, Four, and Five).

The defendant was released from custody on his 2003 Federal Conviction in March 2021, when he began serving a term of supervised release set to expire in or about March 2026.  The defendant engaged in the current offense conduct in or about March 2023, or approximately two years into his five-year supervised release term.

## II. The Defendant's Current Offense Conduct

The charged conduct in this case is straightforward and was in large part captured on body-worn cameras ("BWC") affixed to the New York City Police Department ("NYPD") officers who approached and ultimately arrested the defendant after discovering he was in possession not one but two loaded, semi-automatic guns.  The BWC footage from three Officers (Officer-1, Officer-2, and Officer-3, respectively) captured the key events leading to the defendant's arrest and will be cited herein as "BWC Footage" for each officer.  In addition to the screenshots and descriptions below, the Government will provide the Court with access to and/or copies of the BWC Footage for these three NYPD Officer.  The BWC Footage, combined with factual admissions in the defendant's motion to suppress, and his post-arrest statement, establish the following.

At approximately 9:30 p.m. on March 17, 2023, the defendant was standing with another man in a playground/park area on the grounds of the Butler Houses, a NYCHA housing complex, located on Webster Avenue in the Bronx.  Officers from the New York City Police Department were driving in the area and saw that the defendant and his companion had three unleashed pit bulls—specifically, three dogs that were chained to one another, but that were not being restrained by the defendant or his companion.  The Officers also observed what appeared to be at least one

open container of alcohol. The Officers' body-worn cameras captured images of both the unleashed pit bulls and what appears to be an open glass alcohol bottle, which was sitting on the bench immediately next to where the defendant had been standing, as shown in the example screenshots below:

Officer-1 BWC Footage (Ex. 1) at 1:08 (9:30 p.m.):



Officer-1 BWC Footage (Ex. 1) at 1:51 (9:31 p.m.):



Other than the defendant and his companion, no other people were visible in the immediate vicinity. Officer-1 and Officer-2 exited their vehicle and approached the defendant and the second male on foot. Officer-1 asked the defendant if "Those are your dogs?", to which the defendant

responded "Yes."    The defendant's unrestrained dogs began to move towards the Officers, prompting Officer-1 to say "Watch, they're coming towards us, you gotta put them on the fence man" and for the defendant—who stumbled when attempting to take control of his dogs—to grab the chain that was tethering the dogs together.  Officer-1 told the defendant "I wanna talk to you," and instructed the defendant to "Tie [the dogs] up on the bench or something."    After first appearing to comply with Officer-1's request, the defendant suddenly ran away from the Officers and into an adjacent NYCHA building, abandoning his dogs outside the building.  The Officers immediately began to pursue the defendant, at about 9:31 p.m.  All of the foregoing appears in the Officer-1 BWC Footage (Ex. 1) at 1:00 to 2:03 (9:30 to 9:31 p.m.).

Officer-2 was the first Officer to locate and approach the defendant in the hallway of the third floor of the NYCHA building, about a minute after he fled the park.  (Officer-2 BWC Footage (Ex. 2) beginning at 0:46 (9:32 p.m.)).  The defendant was standing outside of an apartment attempting to gain access to the unit.    The first part of this interaction is without sound, so the BWC does not record what if anything the defendant and Officer-1 were saying during this short period.  However, the video shows that when Officer-1 came upon him, the defendant raised his hands and wrapped them around Officer-1's hands, which were reaching for the defendant.  The defendant immediately began to struggle with Officer-1.  Two additional officers joined Officer-1.  The three Officers attempted to restrain the defendant, who was brought to the ground but continued to struggle.  Officers can be heard telling the defendant they would tase him, that "it's not worth it," and for him to "stop," while the defendant was scuffling with the Officers and yelling for someone in the apartment to "Open the door!"  Officer-1 repeatedly relayed his location to another Officer, in an apparent attempt to obtain backup.  The Officers continued to struggle to obtain control over the defendant; for example, although the defendant's behind and legs were was

down on the ground at this point, the defendant grunted and forced his body up against the Officers, who by this time had only been able to gain control over one of the defendant's hands; the defendant was concealing the second under his body.  (*See, e.g.*, Officer-3 BWC Footage at 1:34-1:50 (9:34 p.m.).  Shortly thereafter, additional Officers arrived in the hallway.  An Officer can then be heard repeatedly demanding that the defendant "Give us your hand."  The defendant continued to struggle, stating among other things "Y'all gonna have to kill me!"  (Officer-1 BWC Footage at 5:23-24 (9:35 p.m.).  The Officers continued to attempt to handcuff the defendant's second hand, when Officer-3 began yelling "Gun! Gun! Gun!".  This interaction—from initial approach in the hallway to recovery of the first gun, from the defendant's hand within his pants/pants pocket—lasted a total of approximately four minutes, from about 9:32 p.m. to about 9:35 p.m.  Thereafter, the defendant continued to struggle, and the Officers attempted to handcuff his second hand.  After the Officers successfully cuffed the defendant's second hand, they lifted him off the ground, revealing a second gun.  All of the foregoing, including the recovery of the second gun, appears in the Officer-2 BWC Footage (Ex. 2) at 0:45-4:58 (9:31 p.m.-9:36 p.m.) and the Officer-3 BWC Footage (Ex. 3) at 0:00-3:56 (9:32 p.m.-9:36 p.m.).

In a *Mirandized* post-arrest statement, the defendant admitted under questioning that he and another man were in the park at the time Officers approached the defendant; that the pit bulls with him were his; that the dogs were unleashed at the time the Officers approached him; that the defendant ran after the Officers kept insisting that he come to them; and that, at some time after fleeing, he had a gun in his hand that he claimed he was trying to throw to "get it off of me."  The defendant denied possessing a second gun. (Def. Post-Arrest Statement (Ex. 4) at 7:28-8:35, 9:30, 14:53, 17:17).

If this case were to proceed to an evidentiary hearing, the Government anticipates that one or more Officers would testify as to additional facts and context surrounding their approach and stop of the defendant.  For example, among other things, the Government anticipates that it would elicit testimony about their prior knowledge of the defendant as someone believed to frequent the area and who might have access to firearms; their observations of the defendant and his companion drinking in the park before approaching them; that the area where the defendant was first approached is a high-crime area where shootings and firearms arrests are common, particularly at night; that when running from the Officers, the defendant appeared to be grabbing or holding his pants tightly, suggesting he was attempting to secure something; and that based on the totality of the circumstances, including the foregoing, as well as the defendant's headlong flight in response to being approached on relatively minor offenses and his resistance to the Officers' attempts to secure his hands, the Officers believed that the defendant might be armed and dangerous.

* * *

As a result of the conduct described above, the defendant was arrested and charged in Bronx County Supreme Court with firearm offenses.  Those New York State charges were ultimately dismissed in light of this federal case, described below.

## III. The Indictment and Superseding Indictment

On June 28, 2023, a grand jury sitting in this district returned an indictment (Dkt. No. 1, the "Indictment") charging the defendant with a single count of being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1).  As alleged in the Indictment, on or about March 17, 2023, the defendant, who is a convicted felon, was found in possession of two loaded, semi-automatic pistols within the Southern District of New York. (Indictment ¶ 1).  After the return of the Indictment, the defendant was transferred from New York State custody to federal custody.

On January 30, 2024, a grand jury sitting in this district returned a superseding indictment (Dkt. No. 20, the "Superseding Indictment") which added language describing three of the defendant's prior felony convictions, including (1) a 2003 federal conviction for possession with intent to distribute crack cocaine, in violation of Title 21, United States Code, Sections 812, 841(a), and 841(b)(1)(C) (the "2003 Federal Drug Conviction"); (2) a 1996 New York State conviction for attempted assault in the first degree, in violation of New York Penal Law Section 120.10 ("the 1996 State Attempted Assault Conviction"); and (3) a 1992 New York State conviction for robbery in the second degree, aided by another, in violation of New York Penal Law Section 160.10(1) (the "1992 State Robbery Conviction").    (Superseding Indictment ¶ 1).    The Superseding Indictment also added a citation to the Armed Career Criminal Act, 18 U.S.C. § 924(e), which triggers a 15-year mandatory minimum sentencing enhancement for defendants convicted under Section 922(g)(1) who have three prior convictions for either a "violent felony" and/or a "serious drug offense."  (Superseding Indictment at 1).[3]

---

[3] As noted above, the defendant was on supervised release at the time of the current offense.  As a result, he has also been charged with violating his supervised release conditions.  As the Court is aware, the defendant's separate supervised release case has been transferred to Your Honor, such that both matters are before the Court.

## ARGUMENT

## I.  THE COURT SHOULD DENY THE DEFENDANT'S ACCA CHALLENGES AS PREMATURE AND SEEKING AN INAPPROPRIATE REMEDY

### A.  Applicable Law

Under the Armed Career Criminal Act ("ACCA"), a defendant charged with being a felon in possession of a firearm is subject to a sentencing enhancement of a 15-year mandatory minimum term of imprisonment if, at the time of his current offense, he had three prior convictions of either a "violent felony" or a "serious drug offense."  18 U.S.C. §§ 922(g)(1), 924(e).  In determining whether a defendant's prior convictions are ACCA-eligible, the court generally uses a categorical approach that looks only to the elements—rather than the facts—of the underlying offense; however, if a defendant has a prior conviction under a divisible criminal statute that effectively sets out "several different crimes," the court may use a modified categorical approach that looks also to limited court-approved documents, such as the charging instrument and guilty plea transcript, to establish which "statutory phrase was the basis for the conviction."  *Descamps v. United States*, 570 U.S. 254, 262-63 (2013) (internal quotation marks and citations omitted).

Whether a prior conviction qualifies as an ACCA predicate is not element of the charged offense as to which the Government has any burden to plead in a charging instrument or to prove to a jury at trial; rather, the applicability of ACCA to a particular conviction—i.e., whether a conviction is a "violent felony" or "serious drug offense"—is determined by the district court at the time of sentencing.  *See, e.g.*, *United States v. Moore*, 208 F.3d 411, 414 (2d Cir. 2000) (rejecting claim that defendant was denied due process when government first discovered the applicability of ACCA after the defendant was convicted, because determination of whether a sentencing enhancement may be sought is "essentially independent of the determination of guilt on the underlying substantive offense" and "there is no constitutional requirement that a defendant

be given notice before trial that a sentencing enhancement pursuant to [ACCA] may be sought after conviction") (internal citations omitted).  *See also, e.g.*, *Johnson v. United States*, 576 U.S. 591, 630 (2015) (discussing ACCA and other "sentencing provisions, which come into play only after the defendant has been found guilty of the crime in question") (Alito, *J.*, dissenting); *Beckles v. United States*, 580 U.S. 256, 273 (describing ACCA as a "sentencing law") (Sotomayor, *J.*, concurring).

## B.  Discussion

The defendant moves to dismiss the portions of the Superseding Indictment that reference his prior convictions and the ACCA sentencing enhancement based on his argument that two of those convictions—specifically, his 2003 Federal Drug Conviction and his 1996 New York Attempted Assault Conviction—are not ACCA-eligible.  (Def. Br. at 2-14).  This challenge is premature, and there is no basis for dismissal of indictment allegations based on an ACCA challenge.

Specifically, the defendant has cited no authority to support his claim that: (1) the applicability of ACCA to a prior conviction must be determined at any time prior to sentencing, and (2) the remedy for an ACCA challenge is the dismissal of any portion of an indictment.  Indeed, these claims are contrary to Second Circuit precedent holding that the Government need not even provide pre-conviction notice of its intention to seek an ACCA sentencing enhancement, which is an issue decided at sentencing.  *See, e.g.*, *Moore*, 208 F.3d at 414 (rejecting due process challenge to application of ACCA despite Government first identifying defendant's third ACCA-eligible conviction after the defendant was convicted at trial).  As a result, the defendant's ACCA challenges are premature, and the remedy for any such challenge—which must necessarily be

resolved post-conviction—would not involve dismissal of any portion of the Superseding Indictment.  This motion should be denied.

Although the defendant's ACCA challenges are not ripe, the Government acknowledges that, based on the currently available record, the Court could not make a determination at sentencing that ACCA applies to Mr. Boone.  To date, the Government has been unable to locate documents that would allow the Court to conduct a modified categorical analysis of the defendant's 1996 New York Attempted Assault Conviction to determine which subsection of NYPL 220.10 he was convicted of violating.  On the current record, therefore, the Court could not find that the defendant is ACCA-eligible because it would not be able to determine that this conviction was for a "violent felony" under ACCA.[4]  Specifically, because the New York assault statute is a divisible statute, and includes a provision that can be violated through a "reckless" rather than intentional *mens rea*, a guilty plea to the assault statute (including attempted assault) that either does not specify which subsection the defendant is pleading to, or is a general plea to the statute as a whole, would not allow the Court to determine that the defendant pled to an intentional crime of violence—as required to qualify as an ACCA predicate.  *See, e.g.*, *United States v. Moreno*, 821 F.3d 223, 230-31 (2d Cir. 2016) (finding that where defendant's record of conviction and related documents showed that he pled guilty to a divisible Connecticut assault statute, which like the New York assault statute includes a reckless assault subsection, the Court

---

[4] Because of the foregoing, the Court has no reason at this time to reach the defendant's separate challenge to whether his 2003 Federal Drug Conviction constitutes a "serious drug offense" for ACCA purposes—a question the Government nevertheless believes would easily be resolved in its favor.  Given the current facts, the Government would request permission to brief this separate issue only if and when it identifies documents that would enable the Court to determine that the defendant's 1996 State Attempted Assault Conviction is a "violent felony," such that the application of ACCA to the defendant would turn on whether his 2003 Federal Drug Conviction is also ACCA-eligible.

could not determine, applying a categorical or modified categorical approach, that the defendant's prior conviction was an aggravated felony for Guidelines purposes). However, the Government is continuing its efforts to locate the original transcript of the defendant's 1996 guilty plea and similar documentation, including through pending requests to the State court reporter's office, to the NYPD records department, and to the U.S. Probation Department, and by retrieving the files for the defendant's 2003 Federal Conviction from the U.S. Attorney's archives. If additional relevant records are identified before the time of sentencing, the ACCA analysis could change. However, as noted above, that question will not be ripe for decision until sentencing.

Based on the foregoing, the Court should deny the defendant's current motion to dismiss the ACCA allegations in the Superseding Indictment and defer a determination as to the applicability of ACCA to the defendant's prior convictions until the time of sentencing.

## II. THE DEFENDANT'S SECOND AMENDMENT CHALLENGES ARE BASELESS

The defendant—who as set forth above has multiple prior state and felony convictions, each of which was a felony punishable by imprisonment for more than one year, and which include at least one violent offense and a federal drug conviction—contends that the Second Amendment guarantees, even for repeated felons like him, a continued right to possess guns. Specifically, the defendant moves to dismiss the Superseding Indictment, arguing that his possession of a firearm after a prior felony conviction is protected by the Second Amendment and that Section 922(g)(1) is unconstitutional both facially and as applied to him, under the Supreme Court's decision in *Bruen*. (Def. Br. at 15-22). He is wrong.

The United States Constitution does not consign society to suffer the arming of felons, and the Supreme Court's Second Amendment jurisprudence, including its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), does not suggest otherwise. To the contrary, the Supreme Court has repeatedly emphasized that statutes barring felons from

possessing guns are presumptively constitutional, and the controlling decision in this Circuit, *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) (per curiam), upholds the constitutionality of the very statute that the defendant attacks. Every judge in this District who has considered a post-*Bruen* challenge to Section 922(g)(1)—including this Court—has reaffirmed its constitutionality. *See, e.g.*, *United States v. Barnes*, No. 22 Cr. 43 (JPO), 2023 WL 2268129 (Feb. 28, 2023).

The Second Circuit has upheld Section 922(g)(1) against a facial challenge—a decision that *Bruen* does nothing to undermine—and there is no support for the defendant's argument that a repeat felon has a Second Amendment right to possess a firearm. Instead, guided by the Supreme Court's numerous statements about the constitutionality of prohibitions on the possession of firearms by felons, and bound by the Second Circuit's holding in *Bogle*, 717 F.3d 281, this Court should conclude that Section 922(g)(1) is constitutional. Finally, the Court should reject the defendant's as-applied challenge because, based on his multiple prior felonies, he falls squarely within the class of persons who can be constitutionally prohibited from carrying guns.

Accordingly, the defendant's motion is meritless and should be denied.

## A. *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on the Possession of Firearms by Felons

The Supreme Court has reiterated, time and again, that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, *J.*, concurring) (confirming that the Supreme Court's most recent decision—in *Bruen*—specifically allows the "longstanding prohibitions on the possession of firearms by felons" blessed in *Heller* and *McDonald*).

Based on the Supreme Court's "emphasi[s] that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281-82 (quoting *Heller*, 554 U.S. at 626, and citing *McDonald*, 561 U.S. at 786 (plurality)).

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, *responsible* citizens" to possess a handgun in the home for self-defense. 554 U.S. at 635 (emphasis added). The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626; *see also id.* at 631 ("Before this Court petitioners have stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified,' by which they apparently mean if he is *not a felon* and is not insane.") (emphasis added)). Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made . . . clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786 (plurality) (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald*, and expressly incorporating as law their discussions ratifying "longstanding prohibitions on the possession of firearms by felons," the Second Circuit held that § 922(g)(1) "is a constitutional restriction on the Second Amendment rights of convicted

felons." *Bogle*, 717 F.3d at 281–82.[5]  Nothing since *Bogle* has placed this conclusion in doubt.[6]
*See*, *e.g.*, *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as good law).

### B.    *Bruen* Does Not Undermine Section 922(g)(1) or *Bogle*

The defendant argues that the Supreme Court's decision last year in *Bruen* abrogated the
jurisprudence upholding the constitutionality of Section 922(g)(1).   (Def. Br. at 21).   This
argument has no merit: it would require the Court to disregard not only *Heller* and *McDonald*, but
also *Bruen* itself.

*Bruen* considered a New York State law that provided for a discretionary "proper cause"
licensing regime to carry a firearm outside the home, which the Second Circuit had upheld using
the means-end framework adopted by several courts of appeals to adjudicate Second Amendment
challenges.  142 S. Ct. at 2122-23, 2125.  The Supreme Court reversed, rejecting the means-end

---

[5] The Second Circuit is not alone.  *See*, *e.g.*, *United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012); *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011); *United States v. Moore*, 666 F.3d 313, 318–19 (4th Cir. 2012); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693–94 (7th Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013).  *See also Bogle*, 717 F.3d at 281–82 ("We therefore join every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons.").

[6] The sole post-*Bruen* appellate holding upon which the defendant now seeks to rely is *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc) ("*Range II*").  (Br. at 17-18, 19-20).  But even in *Range II*, the court did not find Section 922(g) to be facially unconstitutional.  Rather, that decision was narrowly addressed to a defendant with a single misdemeanor conviction for making a false statement on an application for food stamps.  As the majority wrote in that case, "Our decision today is a narrow one," addressed only to defendants "like Range."  Nothing in that opinion suggests that the Third Circuit would reach a similar result in a case involving a defendant, like the defendant, with multiple prior felony convictions, including for robbery—a crime that he concedes by not arguing otherwise in the ACCA context is a "violent felony"—as well as attempted robbery, attempted assault, possession with intent to distribute crack cocaine, and possession of a firearm in furtherance of a drug trafficking offense.

test, *see id.* at 2126-27, and reaffirming "Heller's methodology centered on constitutional text and history," *id.* at 2128-29. Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

But *Bruen* did not undermine all prior Second Amendment precedent in the Courts of Appeals. *See United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (concluding that prior circuit precedent upholding 18 U.S.C. § 922(g)(5)(A) "is undisturbed by *Bruen*, and we therefore remain bound by it"); *United States v. Lucha El Libertad*, No. 22 Cr. 644 (JSR), Dkt. 52 at 2-3 (S.D.N.Y. July 7, 2023) (noting that prior Second Circuit holding that Section 922(a)(3) "does not on its face regulate core Second Amendment conduct survives *Bruen* unscathed"). *Bogle* is wholly consistent with the *Bruen* framework and thus remains good law.

Critically, the Second Circuit did not employ in *Bogle* the means-end test later disapproved in *Bruen*; instead, the Court applied the reassurances of *Heller* and *McDonald* regarding the validity of "'longstanding prohibitions on the possession of firearms by felons.'" *Bogle*, 717 F.3d at 281 (quoting *Heller*, 554 U.S. at 626). And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* are supported by history. *Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting) (explaining that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess

a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications").  It would therefore make no sense to conclude that *Bruen* meant, *sub silentio*, to discard *Heller*'s and *McDonald*'s repeated admonitions that felon-disarmament is wholly consistent with the Second Amendment.  *See Heller*, 554 U.S. at 626, 631; *McDonald*, 561 U.S. at 786 (plurality).

Indeed, *eight* members of the *Bruen* Court have made clear that *Bruen* did *not* upend the Court's prior recognition of lawful firearm regulations.  In *Bruen* itself, six justices took pains to emphasize that the decision did nothing to upset *Heller*'s and *McDonald*'s reassurances.  *See* 142 S. Ct. at 2157 (Alito, *J.*, concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*. . ., about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "longstanding prohibitions on the possession of firearms by felons" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, *J.*, joined by Sotomayor and Kagan, *JJ.*, dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms).  In addition, two years earlier, Justice Thomas and Justice Gorsuch "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals."  *City of New York*, 140 S. Ct. at 1540-41 (Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting).  Thus, eight of the nine members of the

*Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Moreover, the Supreme Court's express limitations of the scope of its holdings—which help couch the boundaries of the test in *Heller* that was repeated in *McDonald* and clarified in *Bruen*—are not dicta. *See*, *e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (explaining that "the Court's language about certain long-standing restrictions on gun possession is [not] dicta" because "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings"); *United States v. Huet*, 665 F.3d 588, 600 n.11 (3d Cir. 2012) ("Although some of our sister circuits have classified the 'presumptively lawful' language in *Heller* as dicta, . . . we disagree."); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta").[7]  However, even if the language upholding the constitutionality of felon-disarmament laws were dicta, it must still "be given considerable weight and [cannot] be ignored in the resolution of the" issue before this Court.  *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see also*, *e.g.*, *United States v. Colasuonno*, 697 F.3d 164, 178-79 (2d Cir. 2012) (acknowledging that it is the "usual obligation to accord great deference to Supreme Court dicta" except in certain circumstances, such as when Congress has "removed or weakened the conceptual underpinnings" of a decision).  In any event, when the Second Circuit adopted the

---

[7] Notably, in *Bruen*, Justice Kavanaugh—joined by Chief Justice Roberts—"wr[o]te separately to underscore two important points about the limits of the Court's decision," one of which was that "the Second Amendment allows a 'variety' of gun regulations," including prohibitions on convicted felons possessing firearms. *Bruen*, 142 S. Ct. at 2161–62 (Kavanaugh, *J.*, concurring). Without Justice Kavanaugh and Chief Justice Roberts, the *Bruen* opinion would not have commanded a majority; accordingly, even if *Heller*'s limitation was once arguably dicta, it is controlling after *Bruen*.

reassurances of *Heller* and *McDonald* as the core basis of its holding in *Bogle*, it became binding in this Circuit.

Accordingly, nothing in *Bruen* undercuts *Bogle*. By following *Heller* and *McDonald*, the Second Circuit necessarily upheld Section 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. By reaffirming *Heller* and *McDonald*, and counseling courts to adhere more closely to those cases, *Bruen* therefore effectively reaffirmed *Bogle*, which drew directly from *Heller* and *McDonald*, and, in any event, did not overrule it. *See*, *e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is 'bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.'" (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004))).

Both the Tenth and Eleventh Circuits have determined that their pre-*Bruen* precedents upholding Section 922(g)(1) without relying on means-end scrutiny survive *Bruen* and remain binding. In *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), the Court found that it was bound by its prior ruling in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009). The Court noted that *McCane*, like *Bogle*, had not employed the two-step test abrogated by *Bruen*. The Court additionally found that the *Bruen* decision, far from suggesting the invalidity of Section 922(g)(1), in fact suggesting the continuing vitality of pre-*Bruen* decisions upholding the law's constitutionality: "Given the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of 'shall-issue' regimes and related background checks, we conclude that *Bruen* did not indisputably and pellucidly abrogate our precedential opinion in *McCane*." *Vincent*, 80 F.4th at 1202. The Eleventh Circuit ruled similarly in *United States v. Dubois*, No. 22-10829 (11th Cir. Mar. 5, 2024), that it was bound by its prior ruling in *United States v. Rozier*, 598 F.3d 768,

770-71 (11th Cir. 2010), upholding the constitutionality of § 922(g)(1). "*Bruen* did not abrogate *Rozier*. Because the Supreme Court made it clear in *Heller* that its holding did not cast doubt on felon-in-possession prohibitions, and because the Court made it clear in *Bruen* that its holding was in keeping with *Heller*, *Bruen* could not have clearly abrogated our precedent upholding section 922(g)(1)." *Dubois*, 2024 WL 927030 at *5 (quotation marks, brackets, and citations omitted). The court further noted that *Rozier*, like *Bogle*, had not employed the two-step test abrogated by the Supreme Court in *Bruen*. *Id.* at *6.

Thus, as every judge within this Circuit to consider the question has concluded, *Bogle* remains binding on courts within this Circuit post-*Bruen*. *See United States v. Gonzalez*, No. 23 Cr. 18 (MKV), Dkt. 40 at 9 (S.D.N.Y. Jan. 9, 2024) ("Every court in this District that has considered whether *Bogle* survives *Bruen* has reached the same conclusion"); *accord United States v. Aramboles*, No. 23 Cr. 643 (AS), 2024 WL 813466, at *1–2 (S.D.N.Y. Feb. 27, 2024); *United States v. Golston*, No. 23 Cr. 362 (AT), Dkt. 31 at 7-9 (S.D.N.Y. Jan. 12, 2024); *United States v. D'Angelo*, No. 23 Cr. 327, Dkt. 26 (PGG), and *United States v. Boone*, No. 23 Cr. 427 (PGG), Dkt. 38 (S.D.N.Y. Dec. 31, 2023); *United States v. Williams*, No. 23 Cr. 218 (VSB), 2023 WL 8355891, at *3 (S.D.N.Y. Dec. 1, 2023); *United States v. Fayton*, No. 23 Cr. 01 (JLR), 2023 WL 8275924, at *5 (S.D.N.Y. Nov. 30, 2023); *United States v. Mitchell*, No. 23 Cr. 198 (ALC), 2023 WL 8006344 at *2 (S.D.N.Y. Nov. 17, 2023); *United States v. Nelson*, No. 22 Cr. 436 (JGK), 2023 WL 6520378, at *2-3 (S.D.N.Y. Oct. 4, 2023); *United States v. Acevedo*, No. 22 Cr. 474 (KPF) (S.D.N.Y. Sept. 14, 2022) (oral ruling); *United States v. Espinal*, No. 23 Cr. 264 (SHS) (S.D.N.Y. Sept. 12, 2022) (oral ruling); *United States v. Davila*, No. 23 Cr. 292 (JSR), 2023 WL 5361799, at *2 (S.D.N.Y. Aug. 22, 2023); *United States v. Hampton*, No. 21 Cr. 766 (JPC), 2023 WL 3934546, at *11–13 (S.D.N.Y. June 9, 2023).

These decisions join the unanimous rulings of judges in this District—including Your Honor—that the clear reasoning of *Heller*, *McDonald*, and *Bruen* foreclose any motion to dismiss a Section 922(g)(1) indictment.  *See United States v. Abreu*, No. 23 Cr. 67 (NSR), 2023 WL 6541302, at \*3–4 (S.D.N.Y. Oct. 6, 2023);  *United States v. Barnes*, No. 22 Cr. 43 (JPO), 2023 WL 2268129 (Feb. 28, 2023); *United States v. Centeno*, No. 22 Cr. 542 (DLC) (S.D.N.Y. Feb. 6, 2023); *United States v. King*, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022); *United States v. Patterson*, No. 19 Cr. 231 (S.D.N.Y. Sept. 9, 2022); *United States v. Adams*, No. 20 Cr. 628 (AKH) (S.D.N.Y. Aug. 10, 2022); *United States v. Maurice*, No. 22 Cr. 48 (VB) (S.D.N.Y. Jul. 14, 2022).

### C.  <u>Text and History Confirm that Section 922(g)(1) is Consistent with the Second Amendment</u>

Even if this Court were to ignore *Bogle* and consider the constitutionality of Section 922(g)(1) anew, the text and historical context of the Second Amendment make clear that Section 922(g)(1) is constitutional.

### 1.  The Text of the Second Amendment and Its Historical Context Make Plain that a Convicted Felon May be Prohibited from Possessing Firearms

Felon-disarmament laws are consistent with the Second Amendment's text, as historically understood.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses.  Put simply, a convicted

felon categorically falls outside the class of law-abiding, responsible persons to whom the Second Amendment applies.

Courts of Appeals have reached this conclusion both before and after *Bruen*. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"); *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment"); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) ("*Range I*") (holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses" can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"), *vacated upon grant of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023).[8]

The Second Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are entitled to be "members of the political community," *Heller*,

---

[8] Although the en banc Third Circuit vacated the panel opinion in *Range* and ultimately reached a contrary result, the panel opinion retains its persuasive value—particularly with respect to its discussion of the historical record. *See Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).

554 U.S. at 580. Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their criminal conduct and convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1868). Felons could therefore historically be excluded from "exercise[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 & n.* (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

Indeed, it remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160 (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal

26

jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement));
*see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction
can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other
rights belonging to members of the political community, Section 922(g)(1) accords with the
historical meaning of the Second Amendment by imposing a firearms-related disability "as a
legitimate consequence of a felony conviction," *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d
678, 708 (6th Cir. 2016) (en banc) (Sutton, *J.*, concurring in most of the judgment).  While "[t]he
Second Amendment establishes a fundamental right for American citizens to possess a gun," the
decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding
prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are
"historically grounded and sensible."  *Id.* (quoting *Heller*, 554 U.S. at 626); *see also, e.g.*, *United
States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180,
1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam);
*Vongxay*, 594 F.3d at 1118.

The defendant suggests that the phrase "the people," as used in the Second Amendment,
cannot vary from its use in other constitutional provisions.  (*See, e.g.,* Def. Br. at 18).  But while
"the people" refers to members of the political community throughout the Constitution, *see Heller*,
554 U.S. at 580, the scope of that community varies from provision to provision.  For example,
noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581; *Perez*,
6 F.4th at 462 (Menashi, *J.*, concurring in the judgment), but certain noncitizens *are* among "the
people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S.
259, 265, 271-73 (1990).  The same is true of felons.  And many other constitutional provisions

use "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

*Bruen* makes plain that those, like convicted felons, who are neither law-abiding nor responsible cannot successfully challenge laws that apply to them based on that status. The Supreme Court made "repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th at 503 (collecting citations); *see also Range I*, 53 F.4th at 271 (observing that the *Bruen* "majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. In another passage, *Bruen* approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law- abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In yet another passage, *Bruen* explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding* citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense." *Id.*

That non-law-abiding citizens can be disarmed under a proper understanding of the constitutional text also explains the Court's specific assurances regarding the permissibility of prohibitions on the possession of firearms by felons. *Heller*, 554 U.S. at 626-27, 627 n.26, 635. In *Heller*, the Supreme Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights." *Id.* at 635. The defendant, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights." *Id.*; *see also id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

The Second Circuit has recognized the same limitation on the Second Amendment's scope in the context of challenges to other regulations: "As to the first step of the analysis, [this Court] ha[s] interpreted the core Second Amendment right identified in *Heller* to be the 'right of *law-abiding, responsible citizens*.'" *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) (quoting *Jimenez*, 895 F.3d at 234; emphasis in *Jimenez*); *accord, e.g.*, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (framing inquiry as whether and to what extent challenged prohibition burdens "the ability of *law-abiding citizens* to possess and use a firearm for self-defense (or for other lawful purposes)" (emphasis added)). And in *Bogle*, of course, the Second Circuit rejected a facial challenge to Section 922(g)(1) based upon *Heller*'s and *McDonald*'s reassurances grounded in history. Laws such as Section 922(g)(1) are therefore constitutional under the Second Amendment's text as informed by a variety of "historical justifications." *Heller*, 554 U.S. at 635.

2.      **Section 922(g)(1) Is Consistent with This Nation's Historical Tradition of Firearms Regulation**

To the extent that the defendant's Second Amendment rights are implicated at all, a review of "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, confirms the validity of laws disarming people because of felony convictions, regardless of whether the felonies were violent.  Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures.  *Id.* at 2133-34 (emphasis omitted).  Two categories of historical evidence are particularly pertinent: (a) laws demonstrating that the right to bear arms has historically been understood to attach to law-abiding individuals, not convicted felons; and (b) laws demonstrating that the right to bear arms has historically been understood to protect only responsible individuals.

a.      **The Right to Bear Arms Has Historically Extended Only to Law-Abiding Individuals**

In England before the Founding, felons had no right to keep and bear arms.  The standard penalty for a felony was death.  *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769).  That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4.  A felon awaiting execution would be held in prison —where he would have no access to arms.  *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony").  A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels— including, of course, his arms.  *See id.* at 379-82.  A convicted felon, finally, was deemed "already dead in law" even before his execution.  *Id.* at 374.  That status, known as "civil death," involved "an extinction of civil rights, more or less complete."  *Avery v. Everett*, 18 N.E. 148, 150 (N.Y.

1888).  A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, to marry";

indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl,

*J.*, dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar

deprivations.  Thus, "death was 'the standard penalty for all serious crimes' at the time of the

founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted); *accord Baze v.*

*Rees*, 553 U.S. 35, 94 (2008) (Thomas, *J.*, joined by Scalia, *J.*, concurring in the judgment) (noting

that capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "the

standard penalty for all serious crimes").  As in England, the death penalty extended even to non-

violent crimes, such as forgery and horse theft.  *See Medina*, 913 F.3d at 158.  Many States also

subjected certain felons to forfeiture of their estates or their goods and chattels.  *See* Beth

A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 15 nn. 275-276 (2014)

(collecting statutes).  And at least some States enacted statutes carrying forward the common-

law doctrine of civil death.  *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).  As

the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have

understood someone facing death and estate forfeiture to be within the scope of those entitled to

possess arms." *Medina*, 913 F.3d at 158.

Because the traditional punishment for serious crimes was death, early legislatures had

little occasion to enact laws explicitly disarming those convicted of such crimes.  They did,

however, enact laws disarming people who had committed certain offenses that were not

punishable by death.  For example, an English statute provided that a person could not "keep arms"

if he had been "convicted in a court of law of not attending the service of the church of England."

4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.).  In 1624, Virginia punished a person for

"base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And a 1775 Connecticut statute provided that anyone convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890). That legislatures disarmed people who had committed those minor offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966).

The founders also understood that the precise type of regulation challenged here is constitutional. Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." 2 The Documentary History of the Ratification of the Constitution 598 (Merrill Jensen ed., 1976).

### b.    The Right to Bear Arms Has Historically Extended Only to Responsible Individuals

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad "discretion to disqualify categories of people from possessing

firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 274 (recognizing historical authority to "categorically disqualify people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact").

*England*.  Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'"  *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626).  Among the limits well established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law.  One law, for example, provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).  Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—that statute reflected the new government's perception that Catholics who refused to renounce their faith were among "those who are unwilling to obey the government and its laws."  *Jackson*, 69 F.4th at 502; *see also Range I*, 53 F.4th at 275 (recognizing that Catholics were disarmed based on "perceived disrespect for and disobedience to the Crown and English law").

That example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations.  *Bruen*, 142 S. Ct. at 2141 (quoting

*Heller*, 554 U.S. at 593). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142. And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the class's members would not abide by the law.

  ***Colonial America***. The American colonies inherited the English tradition of broad legislative authority to disarm classes of people viewed as untrustworthy or dangerous. Firearm regulations directed toward disarming Native Americans and Black people were pervasive.[9] Other colonial laws "followed longstanding English practice" by disarming Catholics who refused to take an oath of allegiance. *Perez*, 6 F.4th at 462 (Menashi, *J.*, concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While those specific "categorical prohibitions of course would

---

[9]  *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); *Records of the Colony of New Plymouth* 173 (1856) (1675 Plymouth law); *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); *The Statutes at Large; Being a Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); *The Laws of Maryland, With the Charter, the Bill of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments* 117-18 (1811) (1715 Md. Law); *The Public Records of the Colony of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From the Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503. More-over, "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." *Range I*, 53 F.4th at 276 (collecting examples).

  ***The Revolutionary War.*** During the Revolutionary War, American legislatures passed numerous laws disarming individuals who failed to demonstrate loyalty to the emergent government. *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 277 (observing that legislatures "disarm[ed] non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"). As described above, an early example was a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in that vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law);

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law).

 ***Ratification Debates***.  The historical background of the Second Amendment's adoption demonstrates that the founders viewed the constitutional right to bear arms as compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law.  One "Second Amendment precursor[ ]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive.  *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).  When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights."  2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971).  Although the Antifederalists did not persuade a majority of the convention to reject ratification on that basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists.  *Id.* at 628.  The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals."  *Id.* at 665 (emphasis added).  Thus, the founding generation recognized that both "crimes committed" and "real danger of public injury" can independently supply grounds for a legislature to prohibit firearm possession.  *See Medina*, 913 F.3d at 158-59 ("The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps), were proper subjects of

disarmament."); *Range I*, 53 F.4th at 280 (observing that the proposal "distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament").

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added).

The Second Amendment as adopted does not include the same language as those proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at 29, could be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because that limitation "was understood"). Given the language of the influential proposals and the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record regarding "sensitive places,"

which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

### c.    Comparison to Section 922(g)(1)

The historical tradition surveyed above demonstrates Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense."  142 S. Ct. at 2133.  Of course, Section 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment.  In any event, the historical record shows that felons were historically subjected to dispossession of firearms—in addition to far more severe consequences, including estate forfeiture and capital punishment. History additionally shows that legislatures disqualified categories of people from possessing firearms, just as felon-dispossession statutes do today, based on legislative judgments that the disarmed people could not be counted upon to be responsible, law-abiding members of the polity.

The defendant suggests that the historical context is insufficient because scholars have not identified a law from the Founding Era that banned felons from possessing firearms.  (Def. Br. at 19).  The Court should reject that argument.  First, the defendant is wrong: the Government has identified multiple laws disarming felons (beyond those that subjected them to death or estate forfeiture and thus, *a fortiori*, disarmament) above discussing statutes disarming those convicted of specific felonies from England, Virginia, and Connecticut.  Second, this argument reflects the precise analytical error that the Supreme Court rejected in *Bruen*: "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  142 S. Ct. at 2133 (emphasis in

original).  By demanding a historical twin, the defendant also effectively asks this Court not to "apply[ ] constitutional principles to novel modern conditions."  *Id.* at 2134.  But *Bruen* teaches that "the Second Amendment's historically fixed meaning applies to new circumstances," and thus the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id.* at 2132.

### D.  <u>The Defendant Falls Squarely Within the Historically Excludable Class</u>

The defendant also raises an as-applied challenge, which is likewise meritless.  (Def. Br. at 15-16).

The Second Circuit has not suggested that Section 922(g)(1) is subject to an as-applied Second Amendment challenge.  *See Bogle*, 717 F.3d at 282-83 (holding that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons").  And the Court should follow the several Courts of Appeals that have concluded that Section 922(g)(1) is constitutional in all of its applications, thus foreclosing as-applied challenges.  *See United States v. Massey*, 849 F.3d 262, 263 (5th Cir. 2017); *Rozier*, 598 F.3d at 771; *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009).  As multiple courts have recognized, "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)," *Jackson*, 69 F.4th at 502, and Section 922(g)(1) is constitutional without regard to considerations such as the location or claimed purpose of the firearm possession, *United States v. Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022), or the defendant's "present contributions to his community, the passage of time, or evidence of his rehabilitation," *Medina*, 913 F.3d at 160-61.

The Second Amendment "permits categorical regulation of gun possession by classes of persons—*e.g.*, felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis."  *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011).  "A prohibition on firearm ownership . . . is a reasonable consequence of a felony

conviction that the legislature is entitled to impose without undertaking the painstaking case-by-case assessment of" considerations like "present contributions to his community, the passage of time, or evidence of his rehabilitation." *Medina*, 913 F.3d at 160-61; *see also United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (warning that to permit "highly fact-specific" as-applied challenges to Section 922(g)(1) would necessitate consideration of "countless variations in individual circumstances" and thus "would obviously present serious problems of administration, consistency and fair warning").

In any event, the only circumstances in which a Court of Appeals has suggested an as-applied Second Amendment challenge to Section 922(g)(1) might be valid involve underlying offenses where "the legislatures classified the challengers' offenses as misdemeanors, the crimes were nonviolent, the punishments imposed were lenient, and other jurisdictions also classified similar crimes as misdemeanors." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 902 (3d Cir. 2020) (describing *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc)); *see also Range II*, 69 F.4th at 98. Indeed, district court cases sustaining as-applied challenges to Section 922(g)(1) have concluded, at the same time, that there *is* a historical precedent for disarming dangerous felons. *See United States v. Forbis*, No. 23 Cr. 133 (GKF), Dkt. 37 at 11 (N.D. Okla. 2023) ("Although our Nation's history and tradition does not support disarming a person merely because they have engaged in felonious conduct, it does support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence through past violent, forceful, or threatening conduct (or past attempts at such conduct).").

Finally, even if an as-applied challenge were available, it would easily fail. The defendant offers no argument based on any circumstance specific to him and his underlying felonies that make the application of Section 922(g)(1) unconstitutional as applied to him. The only case-

specific facts identified in the defendant's brief are that (1) three of the defendant's prior convictions are from "when he was a teenager, nearly thirty years ago," and (2) that his 2003 Federal Conviction was "for federal nonviolent firearm possession and drug offenses."  (Def. Br. at 15-16).  But the defendant's four prior felonies—including a robbery conviction that the defendant effectively concedes as part of his ACCA challenge is a "violent felony"—are sufficiently serious that, even if an as-applied challenge were permissible, he could not succeed in advancing one.  Unlike in *Range*, each of the defendant's multiple prior felony convictions was, in fact, classified by the legislature as a felony—reflecting a legislative determination about the seriousness of the offense and bringing the defendant squarely within the convicted felons whose rights Section 922(g)(1) permissibly restricts.  *See Range*, 69 F.4th at 98 (stating that the defendant's prior conviction "was classified as a Pennsylvania misdemeanor"); *Mitchell*, 2023 WL 8006344, at *8 (distinguishing *Range* and observing that, "[g]laringly, [the] [d]efendant has three narcotics convictions, not a fraud misdemeanor.").  The only circumstances in which a Court of Appeals has suggested an as-applied Second Amendment challenge to Section 922(g)(1) might be valid involve underlying offenses where "the legislatures classified the challengers' offenses as misdemeanors, the crimes were nonviolent, the punishments imposed were lenient, and other jurisdictions also classified similar crimes as misdemeanors."  *Folajtar*, 980 F.3d at 902 (describing *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc)); *see also Range*, 69 F.4th at 98.[10]  Those criteria are not met here.

_____

[10] The defendant also cites several district court cases from outside of this Circuit (Def. Br. at 15-16), but his reliance on those cases is misplaced.  Those cases do not—and cannot—disturb either the Supreme Court's repeated assurances that the Second Amendment does not cast doubt on felon-in-possession laws or the Second Circuit's binding decision in *Bogle*.  Nor are they persuasive.  In *United States v. Bullock*, 2023 WL 4232309 (S.D. Miss. Jan 28, 2023), the court

## III.  THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS SHOULD BE DENIED

### A.  Applicable Law

An officer may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot.  *See Terry* v. *Ohio*, 392 U.S. 1, 30 (1968).  The Supreme Court has held that "reasonable suspicion" is a commonsense, nontechnical concept that deals with the factual and practical considerations of "everyday life on which reasonable and prudent [people], not legal technicians, act."  *Ornelas* v. *United States*, 517 U.S. 690, 695 (1996) (citations omitted).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the

---

concluded that the government's "three-and-a-half-page brief," which "summarily assert[ed] that § 922(g)(1) 'is part of the historical tradition of regulating firearms possession,'" failed to meet the government's burden under *Bruen*.  *Id.* at *4, *29–30.  Likewise, in *United States v. Leblanc*, 2023 WL 8756694 (M.D. La. Dec. 19, 2023), the court concluded that the government had failed to meet its burden of identifying relevant historical sources.  *Id.* at *12-13.  But here, the Government has shown, based on both constitutional text and a robust set of historical precedents, that felons are not among the law-abiding, responsible citizens protected by the Second Amendment and that felon-disarmament statutes are consistent with the Nation's tradition of firearm regulation.  In *United States v. Griffin*, 2023 WL 8281464 (N.D. Ill. Nov. 30, 2023), moreover, the court *rejected* the facial challenge to Section 922(g)(1), concluding that there was a history and tradition of firearm regulation in the United States supporting the disarmament of "dangerous" individuals.  The court in *Griffin* found that there was a requirement for an individualized assessment of whether a given defendant was "dangerous," *id.* at *8-9, but that conclusion is unpersuasive in light of the well-established case law and historical record showing the ability to category prohibit a defined group from possessing arms based on the legislature's categorical assessment as to dangerousness or untrustworthiness.  *See, e.g.*, *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 274.

time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. *See United States* v. *Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)*.*

As is relevant here, the Second Circuit has found that an officer's observation of behavior that suggests the individual has committed a non-criminal, summons offense justifies detention of the suspect to confirm or dispel their suspicions. *See, e.g.*, *id.* at 62 (concluding that it was "constitutionally reasonable for the officers briefly to detain [the defendant] in order to 'confirm or dispel their suspicions'" that the defendant had committed a violation by possessing an open container of alcohol). The Second Circuit has further found that unprovoked flight from officers is a pertinent factor in determining reasonable suspicion. *See, e.g.*, *United States v. Bell*, 733 F. App'x 20, 22 (2d Cir. 2018). Under the New York City leash law, it is a misdemeanor offense to have a dog in a public place that is not "effectively restrained" by a leash of less than six feet long. *See, e.g.*, New York City Health Code NYCHC §§ 161.05 and 10-125(b). *See also Wallace v. Hano*, No. 90 Civ. 2065 (WK), 1992 WL 230139, at *1 (S.D.N.Y. Sept. 3, 1992) (noting that NYC leash law violation is a Class A misdemeanor for which you can be summoned and that is in theory arrestable, but that at the time there was no indication that anyone had ever been arrested *solely* for a leash law violation). In addition, drinking or possessing with intent to drink an alcoholic beverage in any public place, including a "playground" or "park" is an arrestable offense in New York City, subject to exceptions not relevant here. *See* New York City Admin. Code 10-125(b). *See id.* § 10–125(c) (providing that "[p]ossession of an open container containing an alcoholic beverage" creates "a rebuttable presumption" of intent to consume). *See also United States v. Davis*, 111 F.Supp.3d 323, 332, No. 14–CR–0567 (MKB), 2015 WL 3990514, at *5 (E.D.N.Y. July 1, 2015) (noting that open-container violations are "arrestable offenses" under New York City law). Where an officer has probable cause to believe that a defendant is violating the open

container law, the officer has authority to conduct a search incident to arrest on that offense, even

if the officer does not intend to arrest the defendant, or intends only to issue a summons, and

ultimately chooses to arrest the defendant based only on the results of the search—including, for

example, where a gun is recovered as part of such a search. *See, e.g.*, *United States v. Diaz*, 122

F. Supp. 2d 165, 176-79 (S.D.N.Y. 2015) (noting that search resulting in recovery and arrest for

possession of a firearm was incident to potential arrest on an open container violation, even though

officer had only intended to summons the defendant for drinking alcohol in public) (citing *United

States v. Ricard*, 563 F.2d 45 (2d Cir. 1977) for proposition that where an officer had probable

"cause to arrest . . . [on one offense], even if he initially determined not to do so, [there] was a

sufficient predicate for a full search"), *aff'd* 854 F.3d 197 (2d Cir. 2017).

When law enforcement officers make a stop justified by reasonable suspicion, the scope of

the stop must be "reasonably related in scope to the justification for their initiation." *Terry,* 392

U.S. at 29. Thus, the touchstone in assessing the validity of an investigative stop is the

reasonableness of the officer's actions. "Whether a seizure is an arrest, or merely an investigatory

detention, depends on the reasonableness of the level of intrusion under the totality of the

circumstances." *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir. 1991). This reasonableness "must be

justified from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). Moreover, "the fact that an

investigative stop might, in the abstract, have been accomplished by some less intrusive means

does not, in and of itself, render a stop unreasonable." *United States v. Alexander,* 907 F.2d 269,

273 (2d Cir. 1990).

The Second Circuit has set forth a number of factors relevant to whether an investigative

stop was so intrusive as to become a *de facto* arrest. Those factors include the "amount of force

used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *United States v. Perea,* 986 F.2d 633, 645 (2d Cir. 1993) (internal quotation marks and citations omitted). In considering these factors, the Second Circuit has noted that "[n]o single factor" will necessarily convert "a *Terry* stop into a de facto arrest," *Oliveira v. Mayer,* 23 F.3d 642, 646 (2d Cir. 1994), and that more intrusive actions, including the use of handcuffs, can be justified in a *Terry* stop when they are "a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Vargas,* 369 F.3d 98, 102 (2d Cir. 2004).

### B. Discussion

Under the totality of the circumstances, including the Officers' observations that the defendant was standing next to an open bottle of alcohol in a public park at night, that his three pit bulls were unleashed and unrestrained,[11] and his headlong flight upon being asked to speak to the Officers—abandoning his dogs—the officers had reasonable suspicion to conduct a *Terry* stop. As the Second Circuit has put it: "When the noticed presence of officers provokes a suspect's headlong flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect and a *Terry* stop is warranted." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (citing *Wardlow*, 528 U.S. at 125). In *Wardlow*, the Supreme Court explained that

---

[11] The defendant's claim that his dogs were "leashed," as evidenced by the fact when asked by the Officers, he was able to tie the dogs up to a fence, is absurd. The dogs had leashes attached *to them*, but were not in any way secured or being restrained by the defendant. They were not leashed, as that term is commonly understood. Indeed, when asked in his post-arrest interview, the defendant openly admitted that his dogs were unleashed. As shown in the BWC Footage screenshot in the Background section, this was obviously the case.

"nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Wardlow*, 528 U.S. at 124 (collecting cases), and "[h]eadlong flight—wherever it occurs—is the consummate act of evasion." *Id.* The Court there held that a suspect's headlong flight from police, in a high-crime area, was enough on its own to supply reasonable suspicion allowing a *Terry* stop. The *Wardlow* Court recognized that, in general, mere refusal to interact with the police, without more, did not furnish a justification for a seizure. But the Court refused to extend that rule to a suspect's actual flight:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Id.* at 125.

Nor can the defendant argue that the Officers acted improperly in using force in the hallway of the NYCHA building—after the defendant engaged in headlong flight and was located by police—in order to conduct the *Terry* stop for which they had reasonable suspicion. Courts in the Second Circuit and elsewhere have consistently recognized that when a suspect is fleeing, it is reasonable to use force in order to effectuate a *Terry* stop. *See, e.g.*, *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) ("We agree with the District Court that the officers used a greater degree of force than is typical of a *Terry* stop. However, the force was reasonable under the circumstances…."); *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) (affirming determination that it was proper for police to effectuate a *Terry* stop of a fleeing suspect by tackling him; "Once the police have the reasonable suspicion needed to justify an investigatory stop, they may use the forcible means necessary to effectuate that stop, provided their actions are reasonable under the circumstances.").

Here, the BWC Footage shows that after engaging in headlong, unprovoked flight in response to being approached by police, the defendant was attempting to flee into an apartment when he was discovered by Officer-2.  Although the defendant put his hands up upon being approached by Officer-2, when Officer-2 attempted to take the defendant's hands—in an attempt to secure the defendant to conduct an investigatory stop—the defendant immediately began to struggle, causing Officer-2 to use more force in order to detain him and conduct a *Terry* stop. When the defendant further continued to struggle against Officer-2 and the Officers who arrived as backup, the Officers were required to use additional force in an attempt to secure him, including by handcuffing him and taking him to the ground.  The level of force used by the Officers was justified and reasonable under the circumstances, because even with multiple Officers attempting to secure the defendant to conduct a *Terry* stop, they were unable to safely do so, as evidenced by the fact that even after multiple Officers attempting to secure the defendant, he continued to struggle with them on the ground and the Officers were able to handcuff only one of his hands. The length of these efforts were relatively short, and lengthened only by the need to obtain additional backup to overcome the defendant's resistance.  Because there was reasonable suspicion to seize the defendant in order to conduct a *Terry* stop, and because the level of force used by the Officers was reasonable under the circumstances, the stop did not ripen into an arrest.

Even if the Court were to find that the Officers' search of the defendant ripened into an arrest prior to their recovery of two guns from him, such an arrest would have been justified by probable cause to believe that the defendant had committed an arrestable open-container violation. The BWC Footage shows what appears to be an open alcohol container within the defendant's reach in the park where the Officers first approached him, as shown below:

Officer-1 BWC Footage at 1:51 (9:31 p.m.):



The video also makes clear that only the defendant and his companion were in the immediate vicinity of the open container. If this matter were to proceed to an evidentiary hearing, the Government anticipates that one or more Officers would testify that they observed facts leading them to believe that the defendant was violating the open-container law, including because one or more of them saw what appeared to be a bottle of liquor next to the defendant—who other than his companion was the only other person in the park at the time—and that the defendant and his companion both appeared to be drinking. This probable cause gave the Officers authority to arrest the defendant outright, or to conduct a search incident to arrest. Either would render their search and recovery of two guns from the defendant lawful—even if the Officers did not subjectively intend to arrest or even summon the defendant for possessing an open container of alcohol in public. *See Diaz*, 122 F. Supp. 2d at 176 (citing *Ricard*, 563 F.2d 45).

Because sufficient facts to overcome the defendant's motion may be established by a review of the Officers' body-worn camera footage, the defendant's post-arrest admissions, and facts acknowledged in his briefing, the Court should deny the motion to suppress without an evidentiary hearing. If the Court is unable to resolve the motion in the Government's favor on the papers, the Government would request an evidentiary hearing to establish additional facts through the testimony of one or more Officers, including but not limited to testimony about the Officers' awareness of the defendant and observations of the defendant prior to making physical contact

with him, and testimony about the high-crime area in which the defendant was arrested, where shootings and firearm arrests are common.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motions in their entirety.

Dated: New York, New York
      May 10, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York

                 By:      */s/ Jessica Greenwood*
                              Jessica Greenwood
                              Assistant United States Attorney
                              Tel.: (212) 637-1090