UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HENRY BOONE,

                Defendant.

**S1 23 Cr. 328 (JPO)**

# THE GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION TO DEFENDANT HENRY BOONE'S SUPPLEMENTAL MOTION TO SUPPRESS

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Jessica Greenwood
Kevin Grossinger
Assistant United States Attorneys
*Of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

EVIDENCE PRESENTED AT THE HEARING.......................................................... 1

APPLICABLE LAW ........................................................................................................ 11

DISCUSSION .................................................................................................................... 13

    I.    Reasonable Suspicion..................................................................................... 13

    II.    Evidentiary Issues........................................................................................... 20

CONCLUSION ................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Williams*,
    407 U.S. 143 (1972) ........................................................................................................ 12

*Illinois v. Wardlow*,
    528 U.S. 119 (2000) .................................................................................................. 11, 18

*Ornelas v. United States*,
    517 U.S. 690 (1996) ........................................................................................................ 11

*Terry v. Ohio*,
    392 U.S. 1 (1968) ...................................................................................................... passim

*United States v. Anderson*,
    No. 24 Cr. 9 (LTS), 2024 WL 2784332 (S.D.N.Y. May 28, 2024) .......................... 12

*United States v. Andrews*,
    No. 20 Cr. 285 (ARR), 2022 WL 2301987 (E.D.N.Y. June 27, 2022) .................... 18

*United States v. Arvizu*,
    534 U.S. 266 (2002) ........................................................................................................ 15

*United States v. Bell*,
    733 F. App'x 20 (2d Cir. 2018) ..................................................................................... 12

*United States v. Burt*,
    No. 23-6020, 2024 WL 3244380 (2d Cir. July 1, 2024) .......................................... 17

*United States v. Casado*,
    303 F.3d 440 (2d Cir. 2002) ......................................................................................... 13

*United States v. Dixon*,
    No. 20 Cr. 368 (NSR), 2021 WL 106419 (S.D.N.Y. Jan. 12, 2021)........................ 20

*United States v. Glover*,
    957 F.2d 1004 (2d Cir. 1992) ....................................................................................... 14

*United States v. Hagood*,
    78 F.4th 570 (2d Cir. 2023) ..................................................................................... 11, 15

*United States v. Haskins*,
    No. 21 Cr. 269 (PKC), 2022 WL 1460277 (E.D.N.Y. May 9, 2022)....................... 15

*United States v. Hawkins*,
    37 F.4th 854 (2d Cir. 2022) ........................................................................................... 11

*United States v. Jenkins*,
  452 F.3d 207 (2d Cir. 2006) ................................................................ 17

*United States v. Martinez*,
  No. 22 Cr. 175 (DLC), 2022 WL 2384156 (S.D.N.Y. June 30, 2022) ..................................... 19

*United States v. Moore*,
  No. 21 Cr. 270 (WFK), 2022 WL 17250548 (E.D.N.Y. Nov. 28, 2022).......................... 12, 19

*United States v. Muhammad*,
  463 F.3d 115 (2d Cir. 2006) ................................................................ 18

*United States v. Newton*,
  369 F.3d 659 (2d Cir. 2004) ................................................................ 15

*United States v. Padilla*,
  548 F.3d 179 (2d Cir. 2008) ................................................................ 18

*United States v. Rivera*,
  No. 24 Cr. 222 (JGK), 2024 WL 4635500 (S.D.N.Y. Oct. 31, 2024)................................ 12, 15

*United States v. Santillan*,
  902 F.3d 49 (2d Cir. 2018) ................................................................ 15

*United States v. Singletary*,
  798 F.3d 55 (2d Cir. 2015) ................................................................ 11, 12

*United States v. Torres*,
  252 F. Supp. 3d 229 (S.D.N.Y. 2017) ................................................................ 19

*United States v. Weaver*,
  9 F.4th 129 (2d Cir. 2021) ................................................................ 12, 13

**Statutes**

N.Y.C. Admin. Code § 10-125 ................................................................ 12

N.Y.C. Health Code § 161.05 ................................................................ 12, 17

## PRELIMINARY STATEMENT

The Government respectfully submits this brief following the April 25, 2025 suppression hearing on the defendant's supplemental motion to suppress (the "Hearing"). The motion should be denied. The evidence at the hearing — consistent with the Court's June 4, 2023 bench ruling denying the defendant's initial motion to suppress (Dkt. 41 at 20-21) — showed that, based on the totality of the circumstances, law enforcement officers had reasonable suspicion to conduct a *Terry* stop of the defendant.

As to the three categories of evidence upon which the Court reserved ruling during the Hearing, the Court should also: (1) exclude cross-examination of a law enforcement witness on prior instances of conduct not related to credibility; (2) admit portions of the defendant's recorded post-arrest interview in which he admitted relevant facts about his conduct prior to the *Terry* stop; and (3) admit Office Forrester Johnson's body worn camera footage as probative of the facts establishing reasonable suspicion.

## EVIDENCE PRESENTED AT THE HEARING

At the Hearing, the Government called two witnesses from the New York City Police Department ("NYPD"), Detective Nicholas Rios and Special Operations Lieutenant Assistant Andres Uribe, and offered several exhibits: GX 101 (Officer Joseph Canale's body worn camera footage ("BWC")); GX 102 (Officer Uribe's BWC); GX 103 (Officer Johnson's BWC); GX 104-A–G (excerpts of the defendant's recorded post-arrest interview); GX 201 (text message exchange between Detective Rios and Officer Canale); GX 204 (the defendant's NYPD database results (Jan. 20, 2023)); GX 207 (chart showing NYPD database querying of the defendant's name); GX 301 (slide deck). The defense called no witnesses and offered no exhibits. The evidence established the following in sum and substance:

1

In January 2023, Detective Rios — a ten-year veteran of the NYPD — was working as a Field Intelligence Officer ("FIO") assigned to Police Service Area 7 ("PSA-7"). (Tr. 5-6.)[1] PSA-7 covers the several public housing developments in the 40th and 42nd precincts in the Bronx, including the Butler Houses located on Webster Avenue between 169th and 171st Streets. (Tr. 6-9, 92; GX 301 at 1.) PSA-7 in general, and the Butler Houses in particular, are high-crime areas with substantial gang activity, violent crimes, and shots fired. (Tr. 9-10, 57, 94.) FIO Rios's responsibilities included collecting tips from various sources, including civilians, about public safety issues in PSA-7, such as violence, firearms, and narcotics activity; vetting those tips; and transmitting vetted tips to other officers. (Tr. 7-9, 58-60.)

On or about January 18, 2023, FIO Rios received a tip about Henry Boone, the defendant. (Tr. 10, 31-33, 56; GX 207.) An anonymous male called the precinct and told FIO Rios in sum and substance (a) that a person called "Hank Boone"; (b) was an older black male with gray hair; (c) who was in the possession of "more than one" firearm; (d) which the tipster had personally observed on Boone's person, in Mr. Boone's waistband area; (e) outside the Butler Houses, and specifically 1428 Webster Avenue; (f) where Boone walked around with two "big, [] vicious dogs" that made the "police [] scared to stop him" (collectively, the "Tip"). (Tr. 11-13, 16, 51, 68-69.) The tipster sounded fearful. (Tr. 12.) FIO Rios recorded the Tip on a sticky note. (Tr. 14.)[2]

FIO Rios then vetted the Tip. (Tr. 14.) He conducted open-source research, including reviewing social media platforms, and located a Facebook profile page for "Hank Boone," including a photograph. (Tr. 14-15.) Consistent with the information provided by the tipster, the

---

[1] "Tr." refers to the transcript of the April 25, 2025 suppression hearing.

[2] FIO Rios attempted to have the tipster come into the precinct to speak further with him, including to potentially turn the tipster into a registered informant (which would allow FIO Rios to open an ongoing investigation), but the tipster declined to do so. (Tr. 12, 65.)

photograph showed an older black male with gray hair standing in front of a background that FIO Rios recognized — from his extensive experience as an officer working in PSA-7 (Tr. 9, 41) — as an area in the vicinity of the Butler Houses.  (Tr. 41; GX 201 at 1 (photograph).)

FIO Rios also looked up the name "Hank Boone" — together with the proper name "Henry Boone" — on the NYPD's Domain Awareness System ("DAS") database, a desktop computer and mobile application that allows NYPD officers to look up information about individuals.  (Tr. 8, 14-15, 25.)[3]  Consistent with the information provided by the tipster, the DAS report for Mr. Boone generated by FIO Rios on January 20, 2023 (a) listed Mr. Boone's last known address at the Butler Houses: "1408 Webster Avenue, 25L" (Tr. 15; GX 204 at 1) (DAS report); and (b) recorded that Mr. Boone had two prior firearms-related arrests (Tr. 24; GX 204 at 1).  The DAS report did not include a photograph of Mr. Boone.

Having vetted the Tip, FIO Rios assessed that the Tip was credible, and that the Tip did not itself provide probable cause to arrest Mr. Boone.  (Tr. 38, 81.)  Having determined the Tip was credible, FIO Rios passed on the Tip to other officers, including Officer Joseph Canale. (Tr. 33, 38.)  FIO Rios first passed the Tip to Officer Canale verbally, sometime between on or about January 18, 2023 (when he received the Tip) and January 20, 2023 (when FIO Rios and Officer Canale exchanged text messages about Mr. Boone).  (Tr. 33, 38-39, 73; GX 201 at 2; GX 207.)  FIO Rios provided Officer Canale (a) with the contents of the Tip itself and (b) with the information FIO Rios learned from Mr. Boone's DAS report, including Mr. Boone's last known

---

[3] According to NYPD records, January 18, 2023 is the day Mr. Boone's name was queried on DAS by FIO Rios via (a) his own NYPD credentials (at 9:41 a.m. and 1:18 p.m.); and (b) the credentials of another officer with PSA-7, FIO Olivero, who was FIO Rios's partner and whose desk was adjacent to that of FIO Rios's (at 8:47 a.m.).  (GX 207; Tr. 31-33, 36-37.)  FIO Rios explained that his "computer usually would give [him] issues with DAS, so [he] would all the time use [FIO Olivero's] computer because she's a teammate and her computer is available."  (Tr. 32.)

address in the Butler Houses and his two firearms arrests as described above, together with Mr. Boone's other prior arrests and active "I-CARD" (*i.e.*, "investigation card") information showing that there was probable cause to arrest Mr. Boone on a domestic violence incident. (Tr. 24-25, 38, 81.)

On January 20, 2023, FIO Rios and Officer Canale exchanged text messages about Mr. Boone. (Tr. 33, 49; GX 201 at 1 (showing date of "Fri, Jan 20"); GX 201 at 2 (text messages); GX 207 (chart showing that FIO Rios and Officer Canale each queried Mr. Boone's name in DAS on January 20).) FIO Rios provided Officer Canale with the photograph of Mr. Boone that FIO Rios had obtained from Facebook. (Tr. 38, 40, 42-43; GX 201 at 1.) Officer Canale asked FIO Rios, "1428? Or 1408?" (inquiring as to Mr. Boone's address at the Butler Houses), and stated, "I ran him on the phone not one photo pops up" (a reference to querying Mr. Boone's name on DAS, which would have returned Mr. Boone's last known address as 1408 Webster). (Tr. 47-51; GX 201 at 2; GX 204 at 1.) FIO Rios responded, "He's hanging out at 1428" — *i.e.*, 1428 Webster, a building different than the last known address on the DAS report, because the tipster had told FIO Rios that Mr. Boone was at 1428 Webster. (Tr. 50-51; GX 201 at 2; GX 301 at 1, 3 (labeled Butler Houses buildings)).) FIO Rios further wrote, "No eyes on him" / "They have beef so he walked away quick" / "He's scare[d] of him because he flashed the gun" — thus providing Officer Canale with additional information from the tipster, *i.e.*, that the tipster did not currently know where Mr. Boone was because there was some hostility between the tipster and Mr. Boone, and that Mr. Boone had displayed a gun. (Tr. 51-52; GX 201 at 2.) In response, Officer Canale acknowledged the information and wrote, "Gotcha" / "There's nobody out here right now," which, in FIO Rios's view, meant that Officer Canale was on patrol in the vicinity of the Butler Houses at the time of the text exchange and did not observe the defendant. (Tr. 52; GX 201 at 2.)

At no point did FIO Rios ever receive any information inconsistent with the Tip.  (Tr. 52.) Nor did FIO Rios have any further involvement with the *Terry* stop and arrest of Mr. Boone.

On March 17, 2023, Public Safety Officer Andres Uribe — then an almost six-year veteran of the NYPD and PSA-7 (Tr. 87-88) — was working a scheduled 12:00 p.m. to 8:35 p.m. patrol in PSA-7 (the "Patrol").  (Tr. 95.)  Officer Uribe had extensive training and experience in combating violent crimes and firearms crimes in PSA-7; he had participated in over 15 searches that resulted in the recovery of a firearm in the prior year.  (Tr. 88-89.)  Officer Uribe was familiar with the Butler Houses:  He patrolled in and around the Butler Houses often and had dealt with violent crimes and firearms crimes in the vicinity of the Butler Houses.  (Tr. 91-92, 94.)

During the Patrol, Officer Uribe was working with four other officers:  Officers Canale, Carrasquillo, and Johnson, and Lieutenant Query.  (Tr. 96.)  Officer Uribe and Officer Canale were in one patrol car, with Officer Canale driving and Officer Uribe in the front passenger seat; the other officers were in a second patrol car.  (Tr. 96-97.)  The officers were in uniform.  (Tr. 97, 103, 120.)  The cars were unmarked, but recognizable as police vehicles, including because the officers would patrol with their windows down (such that civilians could see the NYPD patches on the officers' shoulders) and because the officers would patrol in the same unmarked vehicles on a daily basis, such that the vehicles "stand[] out."  (Tr. 97, 103, 157.)

At approximately 9:20 p.m., Officers Uribe and Canale were patrolling northbound on Webster Avenue, past the Butler Houses.  (Tr. 101-02; GX 301 at 1, 3.)  The officers were patrolling at 9:20 p.m., notwithstanding that their shift ended at 8:35 p.m., because they were working NYPD-issued overtime due to recent shots fired in the area.  (Tr. 102, 126-27.)  Officers Uribe and Canale were patrolling slowly, in the bus lane on Webster Avenue (the rightmost lane). (Tr. 101; GX 301 at 3.)  While patrolling, Officer Uribe looked to his right, towards the public

playground in front of 1428 Webster— the middle of the three northern Butler Houses (GX 301 at 4-5) — and made two observations.

First, Officer Uribe observed two men standing near the middle benches on the northern side of the playground and believed they were drinking alcohol — a summonsable offense. (Tr. 92-94, 100, 103-05, 107, 146; GX 301 at 5-6.)  Officer Uribe testified that he recalled forming the belief that the two men were drinking, but that by the time of the Hearing, over two years after the observation, he could not recall the details that caused him to form that belief.  (Tr. 105, 168-69.)  Officer Uribe had prior experience observing public consumption of alcohol, including observing consumption in the playground in front of 1428 Webster; in Officer Uribe's experience, it was common for people to drink in that playground, particularly at night.  (Tr. 106-07.)  Officer Uribe also had prior experience writing summonses for the public consumption of alcohol. (Tr. 107.)

Second, Officer Uribe observed multiple dogs, near the two men and roaming the playground, that appeared to be unleashed — also a summonsable offense.  (Tr. 103, 118.)

Officer Uribe made these two observations at a distance of about two to three car lengths. (Tr. 105.)  Although it was dark outside, multiple streetlights made the playground a "well-lit area."  (Tr. 136; GX 301 at 11-14 (BWC still images showing streetlights).)

After making these observations, Officer Uribe said to Officer Canale, in substance, "There's two individuals drinking.  Look, they are drinking over there."  (Tr. 103-04, 147.)  Officer Uribe made this comment because public consumption of alcohol "give[s] [officers] a reason to approach somebody," and "[b]ased on experience, small crimes will sometimes lead to bigger crimes."  (Tr. 107-08.)

In response to Officer Uribe's comment, Officer Canale said, "That's Henry Boone." (Tr. 108, 146.)  Officer Canale then radioed over to the officers patrolling in the second car and said the same thing.  (Tr. 108-09.)  Officer Uribe recognized Mr. Boone's name:  He recalled that, approximately two to three weeks beforehand, he was informed by Officer Canale in the precinct basement — just after FIO Rios had come down to the basement and spoken with Officer Canale (Tr. 149) — that Mr. Boone is an "older gentleman" who "hangs out around the Butler Houses" and who "is known to carry illegal firearms."  (Tr. 109, 150.)  Officer Canale also showed Officer Uribe a photograph of Mr. Boone while they were in the precinct basement.  (Tr. 114.)  Officer Uribe further recalled that, although neither he nor the other officers knew or had previously interacted with Mr. Boone, Mr. Boone "was like a unicorn; everybody has heard of him, but nobody has seen him."  (Tr. 155.)

Having observed Mr. Boone and the other individual in the playground, Officer Canale and Officer Uribe immediately turned right, off Webster Avenue and onto a walkway running adjacent to the playground and towards the entrance to 1428 Webster.  (Tr. 110; GX 301 at 7.)  Officer Canale drove down the walkway to the far entrance to the playground, away from Webster Avenue and near 1428 Webster.  (Tr. 110; GX 301 at 7-8 (red lines showing path driven; green arrows showing entrances to playground).)  Officer Canale drove "very slow."  (Tr. 111.)  While the vehicle proceeded down the walkway, Officer Uribe's head was down because he was querying Mr. Boone's name on the DAS database (using his NYPD-issued phone), in order to determine whether the officers had probable cause to arrest Mr. Boone.  (Tr. 111-16; GX 301 at 10 (BWC still image showing Officer Uribe's head down); GX 207 (showing DAS query).)  However, Officer Uribe "couldn't finish the search" because Officer Canale had stepped out of the vehicle to approach Mr. Boone, and Officer Uribe "immediately followed."  (Tr. 112, 116-17.)

Upon exiting the vehicle, Officers Canale and Uribe observed Mr. Boone, the other man, and the three dogs — pit bulls "that [Officer Uribe] previously observed from the vehicle," which were linked to one another but unleashed and unrestrained. (Tr. 117, 119; GX 101 (Canale BWC); GX 301 at 10 (red line showing location where vehicle parked; GX 301 at 11-12.) Officer Uribe was approximately one to two car lengths away from Mr. Boone at this time. (Tr. 118, 166.) Officer Canale instructed Mr. Boone, "Leave the dogs against the thing" and asked, "Those are your dogs?"; Mr. Boone answered "yes." (GX 302 at 12; GX 101.) The three dogs approached Officer Uribe, and Officer Canale said, "Watch out, they're coming towards us." (GX 301 at 13; GX 101.) Officer Canale again instructed Mr. Boone to gain control of his dogs, stating, "You gotta put 'em on the fence, man, you gotta put 'em on the fence." (Tr. 118; GX 301 at 13; GX 101.) Officer Canale further stated to Mr. Boone, "I wanna talk to you. Leave the dogs there. No no no, tie 'em up on the bench or something." (Tr. 119, 126; GX 301 at 13; GX 101.) Mr. Boone briefly grabbed the chain linking the dogs to each other (but not to anything else), then let go of the chain — disregarding Officer Canale's instructions — and began walking away from the officers towards Webster Avenue, without control of the dogs. (Tr. 119, 174; GX 301 at 13-14; GX 101.) During this interaction, Officers Canale and Uribe did not touch Mr. Boone (or come near him); their weapons were not drawn; they did not run or charge at Mr. Boone; and their vehicle lights were not flashing. (Tr. 119; GX 301 at 13-14; GX 101.)

Continuing to disregard the officers' instructions, Mr. Boone walked out the entrance to the park near Webster Avenue (the opposite entrance from where Officers Canale and Uribe had entered). (GX 301 at 14; GX 101.) Officers Canale and Uribe walked through the playground towards Mr. Boone, and in doing so walked by a bench with a "Hennessy bottle on [it]." (Tr. 121-22; GX 301 at 14-15; GX 101.) Mr. Boone then fled, running northbound towards 1458 Webster.

(Tr. 123; GX 301 at 16-17; GX 101.)  Throughout the officers' interaction with Mr. Boone in the playground, the other individual who had been standing next to Mr. Boone made no movements, faced away from the officers, and did not speak.  (Tr. 121; GX 301 at 14; GX 101.)

Officer Canale and Officer Uribe each pursued the fleeing Mr. Boone, who was running at "top speed."  (Tr. 124; GX 101; GX 102 (Uribe BWC).)  Mr. Boone ran directly towards 1458 Webster on the grass; his dogs ran after him, before being caught on a fence.  (Tr. 124; GX 301 at 17.)  Officer Uribe explained that he took a less direct path to pursue Mr. Boone, first running on the sidewalk, in order to place a fence between him and the unleashed pit bulls.  (Tr. 124.)

While chasing after Mr. Boone, Officer Uribe "observe[d]," from a distance of approximately one to two car lengths, "[Mr. Boone] holding onto his right thigh" with "his left arm freely moving up and down in a running motion"; this behavior suggested to Officer Uribe that Mr. Boone was "holding on to a firearm," because in Officer Uribe's experience, "people don't care about their belongings such as cell phones, wallets; they care about not dropping what they don't want [the police] to see, which in this case was the firearm."  (Tr. 124-25, 177; GX 102.) For this reason, together with the facts (1) that Mr. Boone fled from the Officers at all; (2) that he fled having been approached by Officers "on [] very minor violation[s]," *i.e.*, the unleashed dogs and the public consumption of alcohol; (3) that Officer Uribe previously had learned from Officer Canale that Mr. Boone "is known to carry firearms"; (4) that Officer Uribe knew the Butler Houses to be a high-crime area where shots had recently been fired; (5) that prior to fleeing, Mr. Boone had been "looking away from [the officers], [averting] his body, darting his eyes, looking for a way out" of the playground; and (6) that Mr. Boone had been "disregarding instructions" by Officer Canale to leash his dogs and come talk to the Officers, Officer Uribe "c[a]me to the

conclusion" that, based on the "totality of the circumstances," "Mr. Boone [was] arm[ed] and dangerous." (Tr. 124-25, 177, 180-81, 184.)

Mr. Boone fled from the playground into 1458 Webster. (Tr. 125; GX 301 at 18; GX 101; GX 102.) Officer Uribe lost sight of Mr. Boone as Mr. Boone ran into the building, but followed him into 1458 Webster and located Mr. Boone in the hallway of the third floor. (Tr. 129; GX 301 at 18; GX 102.) Officer Uribe ran towards Mr. Boone with his own hands up; ordered Mr. Boone to show him his hands; and, when Mr. Boone did so, "grabbed the hands." (Tr. 129-30, 180; GX 301 at 18; GX 102.) Mr. Boone "[i]mmediately" "start[ed] resisting," including by "struggling," "kicking," and yelling, "You guys have to kill me. I'm not going." (Tr. 129-30; GX 301 at 18; GX 102.) Other officers came on scene, including Officers Canale and Johnson, and the officers were "giving instructions to Mr. Boone to give up his hands, stop resisting," but Mr. Boone was "not complying." (Tr. 130-31; GX 301 at 19; GX 101; GX 102; GX 103.) The officers attempted to handcuff Mr. Boone, who was lying on the ground on his stomach; during the struggle, Officer Uribe injured his ankle and later went to the hospital for treatment. (Tr. 131-32; GX 301 at 19; GX 101; GX 102; GX 103.) When the officers placed one handcuff on Mr. Boone, but had not fully handcuffed him, Officer Johnson found a firearm on Mr. Boone's person and yelled "gun, gun, gun." (Tr. 130-31; GX 301 at 19; GX 101; GX 102; GX 103.) Officers thereafter fully handcuffed Mr. Boone and lifted him off the ground, after which time they found a second firearm on the ground, underneath where Mr. Boone had been lying. (Tr. 131-32; GX 101; GX 102; GX 103.) Mr. Boone was thereafter transported to the precinct for processing. (Tr. 132.)

The day after the arrest, March 18, 2023, Mr. Boone admitted, in a recorded interview (GX 104) and after being *Mirandized* (GX 104-A), (a) that the officers asked Mr. Boone to "come

here" while he was standing in the playground with the dogs, but "[I] don't do that" (GX 104-B); (b) that the dogs were unleashed (GX 104 at 8:17-8:35); (c) that he "ran" from the officers and knew they were police officers (GX 104-C, 104-E); (d) that he had one firearm in his "hand" at the time he was arrested (GX 104-D); (e) that he had been trying to "throw" the firearm to "get it off of me" (GX 104-E); and (f) that he was "resisting arrest" (GX 104-F).

## APPLICABLE LAW

An officer may conduct a *Terry* stop of a "person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot." *United States v. Hagood*, 78 F.4th 570, 576 (2d Cir. 2023) (ultimately quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Reasonable suspicion is less than probable cause and must be established by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *United States v. Hawkins*, 37 F.4th 854, 857 (2d Cir. 2022) (citations and quotation marks omitted). The reasonable suspicion standard is "not high," *United States v. Singletary*, 798 F.3d 55, 62 (2d Cir. 2015) (citation and quotation marks omitted); it is a "commonsense, nontechnical concept[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act," *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citations and quotation marks omitted). "'Contextual considerations,' such as 'the fact that the stop occurred in a high crime area,' factor into a reasonable-suspicion analysis, and the officers' assessment of an individual's 'nervous' or 'evasive behavior' is 'pertinent' in establishing reasonable suspicion." *Hawkins*, 37 F.4th at 858 (alterations and some quotation marks omitted) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

When determining whether an officer had reasonable suspicion, courts consider "whether an officer has an 'objective' basis" for the *Terry* stop and examine the "totality of the circumstances

through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training, as well as 'commonsense judgments and inferences about human behavior.'" *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (citations and alterations omitted); *see also, e.g.*, *United States v. Moore*, No. 21 Cr. 270 (WFK), 2022 WL 17250548, at *2 (E.D.N.Y. Nov. 28, 2022) (denying suppression motion where "the totality of the circumstances was enough for a reasonable and cautious officer in the officers' shoes to conclude a crime had been committed"). The Second Circuit has found that "headlong flight" from officers is a pertinent factor in determining reasonable suspicion. *United States v. Bell*, 733 F. App'x 20, 22 (2d Cir. 2018) (collecting cases); *see also, e.g.*, *United States v. Rivera*, No. 24 Cr. 222 (JGK), 2024 WL 4635500, at *3-4 (S.D.N.Y. Oct. 31, 2024) (denying motion to suppress where, among other factors, defendant fled when approached by officers); *United States v. Anderson*, No. 24 Cr. 9 (LTS), 2024 WL 2784332, at *5 (S.D.N.Y. May 28, 2024) (same).

The Second Circuit also has found that officers' observations of behavior suggesting the commission of a non-criminal, summonsable offense justifies a seizure to "confirm or dispel their suspicions." *Singletary*, 798 F.3d at 62. Under the New York City leash law, it is a misdemeanor offense to have in a "public place" a dog that is not "effectively restrained" by a leash. N.Y.C. Health Code § 161.05. In addition, drinking or possessing with intent to drink an open container containing an alcoholic beverage in any public place, including a "playground" or "park," is an arrestable offense in New York City, subject to exceptions not relevant here. N.Y.C. Admin. Code §§ 10-125(b)-(c).

A police officer making an investigatory stop "should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972). An officer may therefore conduct a *Terry* frisk to "ascertain whether the suspect has a weapon."

*Weaver*, 9 F.4th at 140.  To do so, the officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *United States v. Casado*, 303 F.3d 440, 445 (2d Cir. 2002) (quotation marks omitted).

## DISCUSSION

### I.    Reasonable Suspicion

Based on the totality of the circumstances, the officers had reasonable suspicion to conduct a *Terry* stop of the defendant.  On the night of the *Terry* stop, the officers — Officer Uribe and Officer Canale — were patrolling past the Butler Houses, a high-crime public housing development in the Bronx, with a history of shootings and firearms arrests.  (Tr. 6-10, 57, 87, 90-94, 101-02; GX 301 at 1-3.)  The officers were familiar with the area and patrolled it often; they were working overtime that night because there had recently been shots fired in the area.  (Tr. 90-95, 102.)  Officer Uribe observed two men with unleashed dogs in the public playground in front of 1428 Webster, and further formed the belief that those men were consuming alcohol — two summonsable offenses for which the officers could have written the men a ticket.  (Tr. 92-94, 100, 103-07, 107, 118, 146, 168-69; GX 301 at 5-6.)  When Officer Uribe relayed his observations to Officer Canale, Officer Canale recognized one of the men as the defendant.  (Tr. 103-04, 108, 146-47.)  Officer Canale had previously received from another officer, FIO Rios, a photograph of the defendant and a vetted Tip that the defendant was an older black male named "Henry Boone" or "Hank Boone" in the possession of multiple firearms in the vicinity of 1428 Webster (one of the Butler Houses), and that the defendant walked around with "big, [] vicious dogs."  (Tr. 11-16, 24, 33, 38-43, 47-53, 68-69, 73, 81; GX 201; GX 204.)  Having recognized the defendant, Officer Canale told Officer Uribe, "that's Henry Boone" — correctly naming the man in the playground as the defendant.  (Tr. 108, 146.)  Upon hearing the defendant's name, Officer Uribe too recognized the name and recalled the Tip, which he had learned from Officer Canale.  (Tr. 109,

114, 149-50.)  Indeed, Officer Uribe explained that the defendant "was like a unicorn; everybody has heard of him, but nobody ha[d] seen him."  (Tr. 155.)  When the officers approached the defendant in the playground, they asked to talk to him and instructed him to leash the dogs — which were linked to each other but unrestrained — but the defendant ignored the officers' questions and instructions beyond acknowledging that the dogs were his and making one brief attempt to control the dogs.  (Tr. 117-19, 126, 174; GX 301 at 11-14.)[4]  During this interaction, Officer Uribe observed the defendant "looking away from [the officers], [averting] his body, darting his eyes, looking for a way out" of the playground.  (Tr. 125.)  Without warning, the defendant fled the playground, running at "top speed" towards 1458 Webster.  (Tr. 123-24; GX 301 at 16-17.)[5]  The officers began to pursue the defendant, and Officer Uribe observed the defendant "holding onto his right thigh" while his left arm was "freely moving up and down in a running motion" — an action consistent with carrying a firearm.  (Tr. 124.)[6]  The combination of the foregoing facts caused Officer Uribe to draw the commonsense and reasonable conclusion that the defendant was armed and dangerous.  (Tr. 124-25, 177, 180-81, 184.)  Viewing these facts from the perspective of a reasonable officer, there was an ample and objectively reasonable basis for the *Terry* stop of the defendant in the hallway of the Butler Houses.[7]

---

[4] The defendant later admitted in his recorded post-arrest interview (a) that the dogs were unleashed (GX 104 at 8:17-8:35) and (b) that the officers asked him to "come here" while he was in the playground, but "[I] don't do that" (GX 104-B).

[5] The defendant later admitted in his recorded post-arrest interview that he fled and that he knew the officers were police officers.  (GX 104-C; 104-E.)

[6] The defendant later admitted in his recorded post-arrest interview that he had a firearm, and that he had been trying to "throw" the firearm to "get it off of me."  (GX 104-D; 104-E.)

[7] There is no dispute that the *Terry* stop here began when Officer Uribe physically touched (and thus seized) Mr. Boone on the third floor of 1458 Webster.  (Tr. 191-92, 195-96; Def. Br. (Dkt. 72) at 3, 10.)  Prior to that point, including in the playground, no Fourth Amendment activity occurred.  *See, e.g.*, *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992) (holding that it was "plain that no seizure had occurred" where officers approached the defendant in a public place and, "in a

The defendant's principal argument in response is to take certain of the foregoing factors *seriatim* and to argue that each factor, viewed in isolation, was insufficient to establish reasonable suspicion. (Def. Br. (Dkt. 72) at 15-28.) But this analytical approach contravenes Supreme Court and Second Circuit precedent, under which courts "do not subject factors pertaining to an officer's reasonable suspicion to . . . a 'divide-and-conquer' analysis." *United States v. Santillan*, 902 F.3d 49, 58 (2d Cir. 2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *see Hagood*, 78 F.4th at 580 (rejecting defendant's argument that certain evidence "could add 'no increment' of reasonable suspicion," because "this 'erroneous divide-and-conquer analysis' misunderstands the totality-of-the-circumstances approach"); *Rivera*, 2024 WL 4635500, at *3 (rejecting defendant's "attempts to segregate each fact and to argue that in isolation none of the facts could justify reasonable suspicion"); *United States v. Haskins*, No. 21 Cr. 269 (PKC), 2022 WL 1460277, at *9 (E.D.N.Y. May 9, 2022) (rejecting defendant's "attempts to strike each element supporting reasonable suspicion for having a slight variance or infirmity"). Under the correct "totality of the circumstances" approach — which the Court has acknowledged is the appropriate method of analysis (Tr. 195; Dkt. 41 at 20) — the officers plainly had reasonable suspicion to justify the *Terry* stop.

---

non-threatening manner, asked [him] certain questions, requested identification, and asked whether [he] would consent to have his bags searched for narcotics" while not displaying any "weapons . . . and there was no physical contact").

Nor is there any dispute that, as the Court previously determined (Dkt. 41 at 21), the officers did not use an impermissible level of force in seizing the defendant. Nor could there be, because "immediately" upon being touched by Officer Uribe, the defendant, including by his own admission (GX 104-F), "start[ed] resisting," including by "struggling" with the officers, "kicking," and yelling at the officers, "You guys have to kill me. I'm not going." (Tr. 129-30; GX 301 at 18; GX 102.) *See United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (holding use of handcuffs reasonable in *Terry* stop because, "where an officer has a reasonable basis to think that the person stopped poses a present physical threat," the officer may "take necessary measures to neutralize the threat" (internal quotation marks and alterations omitted)).

In any event, the defendant's arguments attacking the individual factors forming the officers' reasonable suspicion are meritless.  The defendant first argues that the "anonymous [T]ip" was insufficient by itself to create reasonable suspicion because it was insufficiently documented, made by an anonymous tipster, and unreliable.  (Def. Br. 17-25.)  But the defendant ignores that the contents of the Tip were significantly corroborated.  Upon receiving the Tip, FIO Rios promptly vetted it, including by obtaining a photograph of the defendant consistent with the physical description and location of the defendant described in the Tip (GX 201 at 1), and by obtaining the defendant's DAS report (GX 204), which listed an address and prior firearms arrests, also consistent with the Tip.  On this basis, FIO Rios appropriately concluded the Tip was credible, passed the Tip verbally to Officer Canale (who then passed it to Officer Uribe), and had a further text message exchange with Officer Canale about the Tip (GX 201).  Then, on the night of the *Terry* stop, Officer Canale correctly identified the defendant by name — which he did on the basis of the Tip and photograph he had received from FIO Rios — and Officer Uribe too recognized the defendant's name (together with his reputation as a "unicorn") upon hearing it from Officer Canale.  (Tr. 109, 149, 155.)  On this record, that the Tip was made by an anonymous caller and recorded only on a sticky note (or suffered any other claimed infirmities) does not materially detract from the fact that the Tip was corroborated, reliable, and present in the officers' minds on the night of the *Terry* stop.

Moving on from the Tip, the defendant next argues that the officers' observations of the defendant's unleashed dogs in the playground of the Butler Houses did not by themselves establish reasonable suspicion.  (Def. Br. 25-26.)  The defendant's attempts to suggest that the dogs may have been technically compliant with New York City's leash law because they "were tethered to one another" (Def. Br. 25) is irrelevant, because the officers had an objectively reasonable basis

to believe the dogs were unleashed and approached the defendant in part on that basis.  *See United States v. Burt*, No. 23-6020, 2024 WL 3244380, at *2 (2d Cir. July 1, 2024) (officer had reasonable suspicion to believe that defendant violated traffic law, and "[e]ven if [the officer] were mistaken about whether [the defendant's] conduct violated [the law], he still would have had reasonable suspicion, which may rest on a mistake of law that is 'objectively reasonable'"); *United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir. 2006) (upholding traffic stop where "officers had a reasonable but mistaken belief that the SUV lacked license plates").  The defendant's argument is also wrong on the law:  The defendant's dogs were not in compliance with the leash law because they were in a "public place" and were not "effectively restrained," N.Y.C. Health Code § 161.05(a):  The dogs were in a public playground but not leashed to any bench or fence or pole (Tr. 117-19; GX 301 at 11-14); approached Officer Uribe before being briefly controlled by the defendant (Tr. 174); again were left unrestrained after the defendant let go of the chain linking the dogs to each other (Tr. 174-75); and were able to run freely after the defendant fled, before being caught on a fence (Tr. 175-76, 186-87; GX 102).  Indeed, Officer Uribe testified that he took a circuitous route to pursue the defendant, around a fence, in order to protect himself from the unleashed, running dogs.  (Tr. 124.)

Next, the defendant argues that the presence of alcohol in the playground did not by itself establish reasonable suspicion.  (Def. Br. 23-25.)  But Officer Uribe's belief that the defendant was violating the open container law appropriately formed part of the totality of the circumstances furnishing reasonable suspicion:  The evidence at the Hearing showed that, although Officer Uribe could not recall specifically what he observed while on Webster Avenue that caused him to believe that the defendant and the other man were consuming alcohol, he could recall (a) that he in fact formed that belief on the basis of his experience patrolling the playground of the Butler Houses and (b) that he stated to Officer Canale, in substance, "There's two individuals drinking.  Look

17

they are drinking over there."  (Tr. 103-07, 147.)  Officer Uribe further explained *why* he told

Officer Canale that the men were drinking:  Officers may approach an individual for a "small

crime" like public consumption of alcohol, and in Officer Uribe's "experience, small crimes will

sometimes lead to bigger crimes."    (Tr. 107-08.)    Moreover, Officer Uribe's belief was

corroborated by the fact that BWC footage shows an alcohol bottle on the bench adjacent to where

the defendant was standing — the bench that Officer Uribe walked directly by as he was following

Mr. Boone out of the playground.  (Tr. 121-22; GX 301 at 15.)[8]

Finally, the defendant argues that the defendant's flight from law enforcement did not by

itself establish reasonable suspicion.  (Def. Br. 26-28.)  But courts routinely hold that a defendant's

unprovoked "headlong flight" from officers "in a high-crime area" — as was the case here — is a

significant factor in finding reasonable suspicion.  *United States v. Muhammad*, 463 F.3d 115, 121

(2d Cir. 2006); *see Wardlow*, 528 U.S. at 125 ("Headlong flight . . . is the consummate act of

evasion"); *United States v. Andrews*, No. 20 Cr. 285 (ARR), 2022 WL 2301987, at *23 (E.D.N.Y.

June 27, 2022) ("[C]ourts have found that an individual's change in direction or speed can

contribute to suspiciousness (and headlong running flight particularly so)." (collecting cases)).

At bottom, the defendant's attempt to poke holes in certain of the factors before the officers

ignores that the totality of the circumstances, viewed from the perspective of a reasonable officer,

provided the officers with an ample basis to believe that the defendant was armed and dangerous

and to conduct a *Terry* stop.  *See, e.g.*, *United States v. Padilla*, 548 F.3d 179, 187-89 (2d

Cir. 2008) (reasonable suspicion was present based on defendant's presence in high-crime

---

[8] On this record, Officer Uribe's testimony with respect to the alcohol was not "impeached."
(Tr. 192-93.) As the Government explained, Officer Uribe did not testify that he did not observe
alcohol; he testified only that he could not presently recall specifically what he saw that informed
his belief (which he did recall) that the men were drinking.  (Tr. 201-02.)

neighborhood, following man whose appearance suggested drug down otherwise deserted street at night, and apparent adjustment of concealed firearm); *Rowson*, 652 F. Supp. 3d at 448-49 (upholding *Terry* stop where, "taken together," several "facts permitted an officer to reasonably suspect that [the defendant] was armed and dangerous," including that the stop "occurred in a high-crime area," that the defendant "appeared visibly nervous," and that an officer "observed a distortion in the belt loops of [the defendant's pants] consistent with the presence of a firearm"); *Moore*, 2022 WL 17250548, at *2 (E.D.N.Y. Nov. 28, 2022) (upholding *Terry* stop where "the totality of the circumstances — the anonymous tip, the ongoing emergency, the matching description, the high crime area, [the defendant's] attempt to evade the officers[] and [] refusals to remove his hands from his pockets — was enough for a reasonable and cautious officer in the officers' shoes to conclude a crime had been committed"); *United States v. Torres*, 252 F. Supp. 3d 229, 237 (S.D.N.Y. 2017) (upholding *Terry* stop based on officers' observation of the defendant "in a high crime area, less than two hours after a report of shots fired," the defendant's unprovoked flight, and the officers' observation that the defendant's "pants pocket hung heavy in a manner that was consistent with the weight and size of a firearm, and that his right hand hovered near [that] pocket" — notwithstanding that the officers were "undoubtedly mistaken with respect to certain details").

Indeed, courts have upheld *Terry* stops on thinner records than the evidence adduced at the Hearing. *See, e.g.*, *United States v. Martinez*, No. 22 Cr. 175 (DLC), 2022 WL 2384156, at *2 (S.D.N.Y. June 30, 2022) (finding reasonable suspicion where "[t]he 911 dispatcher put out a radio run describing four men at the apartment building, one of whom was armed, and put out a job report describing the armed individual as a short bald Hispanic man in blue jeans and a green hoodie or jacket," and "[t]he defendant substantially matched the description provided of the

armed man," notwithstanding some "mismatches between the dispatcher's descriptions and the officers' observations"); *United States v. Dixon*, No. 20 Cr. 368 (NSR), 2021 WL 106419, at *5 (S.D.N.Y. Jan. 12, 2021) ("'[T]he apparent adjustment of a concealed firearm' coupled with factors such as presence in a high-crime area has been deemed a sufficient basis for an investigative stop." (collecting cases)). For this reason, even were the Court to credit the defendant's meritless attempts to cast doubt on, for example, whether the defendant was in fact consuming alcohol in public, the remaining circumstances — including the BWC footage (GX 101; GX 102; GX 103) upon which the Court previously relied in denying the defendant's initial motion to suppress (Dkt. 41 at 20-21), and which alone unimpeachably demonstrates the defendant's unleashed dogs in the playground, noncompliance with the officers' instructions to leash the dogs and come speak to them, flight from the officers, and apprehension in the Butler Houses — were more than sufficient to justify a *Terry* stop. The motion to suppress should be denied.

## II.    Evidentiary Issues

The Court reserved determination as to three evidentiary issues: (1) the admissibility of the cross-examination of Officer Uribe on two prior instances of conduct not related to credibility; (2) the admissibility of portions of the defendant's recorded post-arrest interview as to events relevant to reasonable suspicion; and (3) the admissibility of Officer Johnson's BWC footage. (Tr. 3, 85, 188.) The Government addresses each issue in turn.

First, as the Government previously explained (Dkt. 66 at 2-7), the Court should exclude the defense's cross-examination of Officer Uribe about two sets of prior substantiated CCRB allegations (the "CCRB Cross", Tr. 141-44) because the testimony had no bearing on Officer Uribe's truthfulness or credibility. The CCRB Cross confirmed that, although the CCRB allegations involved improper stops, they were completely unrelated to the defendant's arrest, and

did not result in any finding that Officer Uribe engaged in any dishonest conduct.  (Tr. 133.)  Nor do the two prior CCRB allegations suggest (let alone establish) a "pattern" of misconduct, where Officer Uribe has served in the NYPD for nearly 8 years and has participated in "approximately 50 searches or arrests that resulted in the recovery of a firearm" alone, and another approximately 50 searches "beyond [that]."  (Tr. 89, 134.)[9]  In any event, even admitting the CCRB Cross does not suggest that the officers lacked reasonable suspicion to conduct a *Terry* stop in this case.

Second, the Court should admit the excerpts of the defendant's recorded post-arrest interview (GX 104-A–G), because they reflect the defendant's admissions about facts that corroborate the facts known to the officers at the time they conducted the *Terry* stop.  In the post-arrest interview, the defendant admitted that he had unleashed dogs in the playground (GX 104 at 8:17-8:35); that he fled from the officers and that he knew they were police officers (GX 104-B, -C, -E); that he was in the possession of a gun at the time he was apprehended (GX 104-D); that he was trying to "throw" the gun away (GX 104-E); and that he was "resisting arrest" (GX 104-F).  Although these statements were made after the defendant's arrest, as the Government previously explained (Dkt. 66 at 7-9) and as the Court acknowledged during the Hearing (Tr. 3-4, 189), the statements go to facts in existence before the arrest, and therefore are relevant to whether the officers had reasonable suspicion.  In any event, even absent the post-arrest interview, the totality of the circumstances still amply supported reasonable suspicion here.

Third, with respect to Officer Johnson's BWC footage (GX 103), the BWC is admissible because it shows (a) the defendant's attempts to physically resist the officers as they sought to handcuff him; and (b) the recovery of the two firearms.  These facts are plainly relevant to the

---

[9] The defendant cites no authority for the baseless proposition that the Court may consider the substantiated CCRB allegations as to *other officers* in assessing the credibility of a particular officer.  (Def. Br. 12.)

Court's analysis of the reasonableness of the *Terry* stop being conducted by the officers shown in the video.  In any event, even absent that footage, the totality of the circumstances still amply supported reasonable suspicion here.

## **CONCLUSION**

For the foregoing reasons, the Court should (1) deny the defendant's supplemental motion to suppress; (2) exclude the cross-examination of Officer Uribe regarding two prior instances of conduct not related to credibility; (3) admit the excerpted portions of the post-arrest interview at GX 104-A–G; and (4) admit Office Foster's BWC at GX 103.

Dated:  New York, New York
       June 20, 2025

                         Respectfully submitted,

                         JAY CLAYTON
                         United States Attorney

By:      _____
                         Jessica Greenwood
                         Kevin Grossinger
                         Assistant United States Attorneys
                         (212) 637-1090 / 2426